## DAVIS'S ADMINISTRATOR *v.* WEIBBOLD.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF MONTANA.

No. 219. Submitted March 3, 1891.—Decided April 6, 1891.

The provisions of the public town-site laws prohibiting acquisition of title thereunder to mines of the precious metals, and protecting therefrom possessory claims under the mining laws, must be construed in accord with the uniform exception in Federal legislation of mineral lands from grant or sale, and held merely to prohibit passage of title thereunder to mines of gold, silver, cinnabar or copper which are known to exist on the issue of the town-site patent, and to mining claims and possessions then lawfully existing. Such exceptions include only those lands which at the date of the grant are of known sufficient mineral value and extent to justify expenditures for the extraction of the mineral.

Town-site patent of earlier date covering same premises embraced in junior mining patent carries the title in absence of proof establishing the known existence of the mine at date of such town-site patent. The claimant under the town-site patent may offer evidence to prove that the premises were not known to be valuable for minerals at date thereof to rebut the presumption *contra* indulged, without proof, solely from the fact of issue of such mineral patent.

Exception from the mineral patent of town-site occupancy and improvements, within recited limitations, is unimportant. A mineral patent carries with it all rights which the law confers, and officers of the Land Department cannot enlarge or diminish those rights by any reservation beyond or differing from those contained in the law.

The mining laws provide for exploration and purchase of the mineral lands of the United States, and where prior to town-site patent proceedings thereunder to acquire title are initiated, the same may be prosecuted to completion afterwards. But in absence thereof, on issue of town-site patent and conveyance to individuals thereunder, the premises become private property, and jurisdiction to grant patents of them under the

mining laws no longer exists. While the patent of the government is exempt from collateral attack in actions at law, such exemption obtains only where jurisdiction of the Land Department over the land, and power to determine the facts necessary to such issue, exist.

THE case, as stated by the court, was as follows:

This is an action for the possession of a parcel of mining land in Silver Bow County, formerly Deer Lodge County, of the Territory, now State, of Montana. It is designated in the complaint as a quartz lode, known as the Gold Hill lode mining claim, in the Summit Valley mining district in that county, and is described by metes and bounds. It is alleged to contain seven acres and a fraction of an acre of land, and to embrace 1460 linear feet of the Gold Hill lode. The complaint avers that in January, 1881, the plaintiff was the owner and entitled to the possession of the property; that afterwards, in June, 1881, while he was still owner and entitled to its possession, the defendants wrongfully and unlawfully entered thereon and withhold the same from him, to his damage of $5000; and that its rents and profits during that time amount to $10,000. The plaintiff therefore prays to be adjudged its owner and to be entitled to its possession, and for his damages in the sum of $15,000.

One of the defendants, Andrew J. Davis, the appellant here, appeared to the action and filed a separate answer to the complaint, denying the ownership by the plaintiff, or his right to the possession of portions of the quartz lode mining claim described in the complaint, which portions are designated as certain lots in block thirteen, in Butte City, Silver Bow County, according to the official survey of the town site in the recorder's office of the county; and as to the residue of the premises, described in the complaint, disclaiming any right or interest therein. He further denied that he ever entered upon the lots described without right or title and ejected the plaintiff therefrom, and also the alleged value of the rents and profits since such supposed entry.

Davis, as a separate defence, also set up, in bar of the action, the statute of limitations of Montana, and that he and those

under whom he derived his interest had been in possession of the lots described more than five years, under a claim of title founded upon a written conveyance thereof, exclusive of any other right.

It is not disclosed by the record that any other of the defendants appeared in the action. To the answer filed the plaintiff replied traversing the averments of the separate defence.

On the trial, which followed, the plaintiff relied upon the patent of the United States for the mining claim described in the complaint, issued to him, bearing date January 15, 1880. It recites that in pursuance of the provisions of the Revised Statutes of the United States — chapter 6, Title 32 — there had been deposited in the General Land Office of the United States the plat and field-notes of survey of the claim of Heinrich C. Wiebbold (the plaintiff herein) upon the Gold Hill lode, accompanied by the certificate of the register of the land office at Helena, in the Territory of Montana, whereby it appeared that in pursuance of the Revised Statutes, Wiebbold did, on the 19th of September, 1878, enter and pay for said mining claim or premises, being mineral entry No. 438, in the series of said office, designated by the surveyor-general as lot No. 65, in the district of lands subject to sale at Helena, containing seven acres and sixty-hundredths of an acre of land, more or less; and which is fully described by metes and bounds.

The following is the granting clause of the patent, with the conditions and stipulations annexed:

"Now, know ye, that the United States of America, in consideration of the premises and in conformity with the said Revised Statutes of the United States, have given and granted, and by these presents do give and grant, unto the said Heinrich C. Wiebbold and to his heirs and assigns the said mining premises hereinbefore described as lot No. 65, embracing a portion of township three (3), north of range eight (8), west of the principal meridian, *with the exclusive right of possession and enjoyment of all the land included within the exterior lines of said survey not herein expressly excepted from these presents*

and of fourteen hundred and sixty (1460) linear feet in the said Gold Hill vein, lode, ledge or deposit for the length hereinbefore described throughout its entire depth, although it may enter the land adjoining, and also all other veins, lodes, ledges or deposits throughout their entire depth, the tops or apexes of which lie inside the exterior lines of said survey at the surface, extended downward vertically, although such veins, lodes, ledges or deposits in their downward course may so far depart from a perpendicular as to extend outside the vertical side lines of said survey : *Provided,* That the right of possession hereby granted to such outside parts of said veins, lodes, ledges or deposits shall be confined to such portions thereof as lie between vertical planes drawn downward through the end lines of said survey at the surface, so continued in their own direction that such vertical planes will intersect such exterior parts of said veins, lodes, ledges or deposits, *excepting and excluding, however, from these presents all town property rights upon the surface, and there are expressly excepted and excluded from the same all houses, buildings, structures, lots, blocks, streets, alleys or other municipal improvements on the surface of the above-described premises not belonging to the grantee herein, and all rights necessary or proper to the occupation, possession and enjoyment of the same : And provided further,* That nothing in this conveyance shall authorize the grantee herein, his heirs or assigns, to enter upon the surface of a mining claim owned or possessed by another ; to have and to hold said mining premises, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging, unto said Heinrich C. Wiebbold and to his heirs and assigns forever, subject, nevertheless, to the following conditions and stipulations.

" First. That the grant hereby made is restricted to the land hereinbefore described as lot No. 65, with fourteen hundred and sixty (1460) linear feet of the Gold Hill, throughout its entire depth as aforesaid, together with all other veins, lodes, ledges or deposits throughout their entire depth as aforesaid, the tops or apexes of which lie inside the exterior lines of said survey.

"Second. That the premises hereby conveyed, with the exception of the surface, may be entered by the proprietor of any other vein, lode, ledge or deposit, the top or apex of which lies outside the exterior limits of said survey, should the same in its downward course be found to penetrate, intersect, extend into or underlie the premises hereby granted, for the purpose of extracting and removing the ore from such other vein, lode, ledge or deposit.

"Third. That the premises hereby conveyed shall be held subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes, rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local laws, customs and decisions of courts.

"Fourth. That in the absence of necessary legislation by Congress the legislature of Montana may provide rules for working the mining claim or premises hereby granted, involving easements, drainage and other necessary means to its complete development.

"In testimony whereof, I, Rutherford B. Hayes, President of the United States of America, have caused these letters to be made patent and the seal of the General Land Office to be hereto affixed.

"Given under my hand, at the city of Washington, the fifteenth day of January, in the year of our Lord one thousand eight hundred and eighty, and of the independence of the United States the one hundred and fourth.

"By the President:　　.　　R. B. Hayes,

　　　　　　　　　"By Wm. H. Cook, *Secretary.*

"S. W. Clark, *Recorder of Gen. Land Office.*"

To the introduction of this patent the defendant objected, on the ground that the exception contained in it excluded all town lots from the grant, and that it was necessary for the plaintiff to show that the property in controversy did not consist of lots thus excepted. But the court overruled the objection, and allowed the patent to be introduced; and to the ruling the defendant excepted.

The defendant, to maintain the issue on his part, introduced a patent of the United States, bearing date September 26, 1877, issued to Orville B. O'Bannon, probate judge of Deer Lodge County, Montana Territory, in trust for the use and benefit of the occupants of the town site of Butte, in that county. It recites that the probate judge, by virtue of the act of Congress of March 2, 1867, entitled "An act for the relief of the inhabitants of cities and towns upon the public lands," had deposited in the General Land Office of the United States a certificate of the register of the land office at Helena, Montana Territory, whereby it appeared that full payment had been made by the probate judge in trust as aforesaid, according to the provisions of the act of Congress of April 24, 1820, entitled "An act making further provisions for the sale of public lands;" for the tract of land constituting the town site of Butte, embracing one hundred and eighty-three acres and a fraction of an acre, and of which a full description is given by metes and bounds. The following is its granting clause :

"Now, know ye, that the United States of America, in consideration of the premises and in conformity with the several acts of Congress in such case made and provided, have given and granted, and by these presents do give and grant, unto the said Orville B. O'Bannon, probate judge as aforesaid, in trust as aforesaid, and to his successors the said tract above described; to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging, unto the said Orville B. O'Bannon, probate judge as aforesaid, in trust as aforesaid, and to his successors and assigns in trust as aforesaid. *No title shall be hereby acquired to any mine of gold, silver, cinnabar or copper, or to any valid mining claim or possession held under existing laws of Congress.*

"In testimony whereof I, Rutherford B. Hayes, President of the United States of America, have caused these letters to be made patent and the seal of the General Land Office to be hereunto affixed.

. " Given under my hand, at the city of Washington, the twen-ty-sixth day of September, in the year of our Lord one thou-sand eight hundred and seventy-seven, and of the independence of the United States the one hundred and second.

" [SEAL.]      By the President:      R. B. HAYES,

"By B. LANG, *Secretary.*

"S. W. CLARK, *Recorder of General Land Office.*"

The defendant also introduced a deed from the probate judge to himself, dated March 24, 1877, of the lots claimed by him in his answer. This deed recites that the site of the town of Butte had been duly entered by the probate judge, pursuant to the act of Congress; that a portion of the lots in such town site were regularly preëmpted and conveyed by the probate judge to the parties entitled thereto; that there remained a portion · of the town lots unclaimed after the expiration of sixty days; that in pursuance of the act of the legislature of Montana Territory relating to the preëmption of town sites and the disposal of lots therein, the probate judge had given notice more than ten days that he would sell, on a day desig-nated, at public sale, certain of the lots remaining unclaimed; that in pursuance of the notice the property described in the deed was, on the 12th of March, 1877, offered for public sale, and no bid having been received therefor, and the property offered being thereby rendered subject to private entry, the party of the second part, the defendant herein, had filed with the probate judge an application to enter the same; and there-fore, in consideration thereof, and of the sum of $220 paid, the probate judge, by virtue of the authority vested in him by the acts of Congress and the legislature of Montana, thereby remised, released and quit-claimed unto the said party of the second part the property described in his answer, with the exception of three lots, to have and to hold the premises, together with all the rights, privileges and appurtenances thereunto belonging, to himself and to his heirs and assigns, as fully as by virtue of the acts of Congress and of the legis-lature of Montana, and the proceedings thereunder, the said party of the first part could convey the same.

The defendant then offered himself ·as a witness to prove that, for the five years preceding the commencement of the action, he had been in the exclusive possession of the premises, with the exception of three lots, as set forth in his answer, under the patent to the probate judge, and the latter's deed to him, under a claim of title exclusive of other rights, founding his claim upon those conveyances; but the plaintiff objected that the patent to the Gold Hill lode was issued June 5, 1880, and the action was commenced on the 8th day of August, 1884, showing that five years had not elapsed between the issuing of the patent and the commencement of the action, which objection the court sustained, and to the ruling an exception was taken.

The defendant also offered to prove by sundry witnesses that at the time the patent of the Butte town site to the probate judge was issued in trust for its occupants, the premises embraced by the Gold Hill lode were not known to be valuable for minerals of any kind. To this evidence objection was taken, on the ground that the patent to the plaintiff proved that the premises contained valuable minerals, and as such could not be granted by the patent for the town site, which objection the court sustained, and to the ruling an exception was taken. Evidence was also introduced by both parties as to the value of the rents and profits of the property.

No other evidence was given or offered than as above stated. The court gave judgment that the plaintiff recover possession of certain portions of the premises claimed, which portions are designated by lots in block thirteen of Butte City, and that a writ of restitution issue. therefor; and also that the plaintiff recover $900 as damages for the detention of the property. On appeal to the Supreme Court of the Territory the judgment was affirmed, and to review this latter judgment the case was brought to this court by appeal, the statute providing that mode of bringing up the case for review here instead of by a writ of error. Pending this appeal the appellant died, and the case was, by order of the court, continued in the name of his special administrator, James A. Talbott.

*Mr. James W. Forbis* for appellant.

*Mr. S. M. Stockslager* for appellee.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The record in stating the judgment below does not show any findings of fact by the court, which tried the case without the intervention of a jury. The order for the judgment necessarily implies that the facts were found by the court upon which the order was made, but, like a verdict of a jury, the findings should properly appear in the record. The omission, it is true, was not noticed by counsel in the Supreme Court of the Territory, nor has it been called to our attention. It was probably a mistake of the copyist in making the transcript, for the argument has proceeded upon the theory that such findings were made. The plaintiff assigns as one of the errors committed that the court erred " in finding for plaintiff on all of the issues presented in the pleadings." We have, therefore, passed by this omission, and permit the party who defends the ruling below to supply the defect.

In *Deffeback* v. *Hawke*, which was before us at October term, 1885, (115 U. S. 392,) we examined at some length the legislation of Congress excepting lands containing minerals from sale or other disposition under laws providing for the alienation of portions of the public domain either for settlement or in aid of public institutions or works of internal improvement. It appeared upon such examination that until the act of July 26, 1866, such exception was general, but by that act the policy of reserving mineral lands from sale or grant was changed. Such lands of the public domain, both surveyed and unsurveyed, were thereby declared to be free and open to exploration and occupation by all citizens of the United States and those who had declared their intention to become citizens, subject to such regulations as might be prescribed by law, and to the local customs or rules of miners in mining districts, so far as they were not in conflict

with the laws of the United States.   14 Stat. c. 262, sec. 1, p. 251.

By the act of May 10, 1872, to promote the development of the mining resources of the United States, (17 Stat. p. 94, c. 152, § 9,) the first section of the act of 1866, declaring the mineral lands of the United States free and open to exploration and occupation, was repealed, and in place of it a provision was adopted declaring that "all valuable mineral deposits," in lands belonging to the United States, both surveyed and unsurveyed, were free and open to exploration and purchase, subject to conditions similar to those in the original act.   The Revised Statutes, which embody the law of the United States in force on the first of December, 1873, in its treatment of mineral lands, provided that "in all cases lands valuable for minerals" should be reserved from sale, except as otherwise expressly directed by law, (§ 2318;) but at the same time repeated the declaration, that all valuable mineral deposits in lands belonging to the United States should be free and open to exploration and purchase.   § 2319. After that date title to mineral lands, known at the time to be valuable, could only be acquired under provisions specially authorizing their sale, except in certain States, which exception does not affect the question now before us.

Chapter eight, Title thirty-two, of the Revised Statutes, contains the law for the reservation and sale of town sites on the public lands.   Among other things it provides for the entry, at the local land office, of any portion of the public lands occupied as a town site by its corporate authorities, or, if the town be unincorporated, by the judge of the county court of the county in which the town is situated ; the entry to be "in trust for the several use and benefit of the occupants thereof, according to their respective interests;" and the execution of the trust and the disposal of the lots in the town to be conducted under such regulations as may be prescribed by the legislative authority of the State or Territory in which the town is situated.   It also provides that the entry shall include only such land as is actually occupied by the town, and the title to which is in the United States; and

declares that "where mineral veins are possessed, which possession is recognized by local authority, and to the extent so possessed and recognized, the title to town lots to be acquired shall be subject to such recognized possession and the necessary use thereof;" with the reservation, however, that nothing in the section shall be so construed as to recognize any color of title in possessors for mining purposes as against the United States. By another section of the chapter, and near its close, it is enacted that "no title shall be acquired" under its provisions "to any mine of gold, silver, cinnabar or copper; or to any valid mining claim or possession held under existing laws." Sec. 2392.

In *Deffeback* v. *Hawke*, we said of this statement of the legislation of Congress, that it was plain that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar or copper, could be obtained under the preëmption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, — except in certain States, not affecting the question before us, commenting particularly upon the terms *known* and *valuable* used in connection with the minerals in public lands, implying that they must be of that character to bring the lands within the exception of mineral lands from sale or grant by the United States.

In that case there was no dispute as to the mineral character of the land claimed by the plaintiff under his mining patent, when the town site was entered by the probate judge at the local land office. Proceedings for the acquisition of the mining claim had been previously initiated, the entry of the same had been had, and payment of the price made to the government; and when the patent subsequently issued it took effect by relation at the date of the entry, that being the earliest evidence of any movement for the acquisition of the title of the government. Here the case is different; here the Butte town site had been entered at the local land office by the probate judge of the county and the patent of the United States in due form issued to him in trust for the occupants of

the town, before the date of the mining patent, or the entry of the mining claim at the local land office. And before that time a deed had been made by the probate judge to the defendant of the premises occupied by him, to recover which the present action is brought.

When the entry of the town site was had, and the patent issued, and the sale was made to the defendant of the lots held by him, it was not known — at least it does not appear that it was known — that there were any valuable mineral lands within the town site, and the important question is whether in the absence of this knowledge the defendant can be deprived under the laws of the United States of the premises purchased and occupied by him because of a subsequent discovery of minerals in them and the issue of a patent to the discoverer.

After much consideration we have come to the conclusion that this question must be answered in the negative. It is true the language of the Revised Statutes touching the acquisition of title to mineral lands within the limits of town sites is very broad. The declaration that "no title shall be acquired" under the provisions relating to such town sites, and the sale of lands therein "to any mine of gold, silver, cinnabar or copper; or to any valid mining claim or possession held under existing laws," would seem on first impression to constitute a reservation of such mines in the land sold, and of mining claims on them, to the United States; but such is not the necessary meaning of the terms used; in strictness they import only that the provisions by which the title to the land in such town sites is transferred shall not be the means of passing a title also to mines of gold, silver, cinnabar or copper in the land, or to valid mining claims or possessions thereon. They are to be read in connection with the clause protecting existing rights to mineral veins; and with the qualification uniformly accompanying exceptions in acts of Congress of mineral lands from grant or sale. Thus read they must be held, we think, merely to prohibit the passage of title under the provisions of the town site laws to mines of gold, silver, cinnabar or copper, which are known to exist, on the issue of the town-site patent. and to mining claims and mining pos-

sessions, in respect to which such proceedings have been taken under the law or the custom of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth. The exceptions of mineral lands from preëmption and settlement and from grants to States for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness and to justify expenditure for its extraction, and known to be so at the date of the grant. There are vast tracts of country in the mining States which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their exploitation. It is not to such lands that the term mineral in the sense of this statute is applicable.

On this subject there has been great uniformity of decision by those courts of the States and of the United States which have had the most frequent occasion to consider the subject, and by the Land Department.

In *Alford* v. *Barnum*, 45 California, 482, before the Supreme Court of California in January, 1873, the question arose as to the meaning of the term mineral lands in the acts of Congress of July 1, 1862, and July 2, 1864, excepting such lands from the grants made by Congress to aid in the construction of a railroad and telegraph line across the continent. In the act of 1862 the language is that all mineral land shall be excepted from the operation of the act. 12 Stat. p. 492, c. 120, sec. 3. In the act of 1864, amending the act of 1862, it is declared that the term mineral land, whenever it occurs in the act, and the act to which that was an amendment, shall not be construed to include coal and iron lands. 13 Stat. p. 358, c. 216, sec. 4. The action in that case was to abate a ditch as a nuisance. The complaint alleged that the plaintiff was the owner of a section of land in California, and that the defendants were digging a ditch across the same, which was to be used for mining purposes. The defendants answered that the

land was public mineral land of the United States, and that they were mining thereon for gold. The plaintiff at the time was in possession of the land under a contract of purchase from the railroad company, which had a patent from the United States under the acts of 1862 and 1864, and it was contended that the land was mineral land, excepted both by the acts of Congress and by the patent, which contained similar provisions. The plaintiff having recovered in the court below, the case was taken to the Supreme Court, where the court, in considering the question, said: "The mere fact that portions of the land contained particles of gold, or veins of gold-bearing quartz rock, would not necessarily impress it with the character of mineral land, within the meaning of the acts referred to. It must at least be shown that the land contains metals in quantities sufficient to render it available and valuable for mining purposes. Any narrower construction would operate to reserve from the uses of agriculture large tracts of land which are practically useless for any other purpose, and we cannot think this was the intention of Congress."

In *Merrill* v. *Dixon*, 15 Nevada, 401, the Supreme Court of Nevada held that in excluding mineral lands from the grant to the Pacific Railroad Company, Congress only intended to reserve lands valuable for mining purposes; citing the California case.

In *Cowell* v. *Lammers*, 10 Sawyer, 246, 257, the question came before the Circuit Court of the United States for the District of California, as to the meaning of mineral lands in the grant to the Pacific Railroad Company. That company having completed its road in accordance with the provisions of those acts, a patent was issued to it, the granting clause of which excepted and excluded all mineral lands, should any be found to exist in the tracts described. Judge Sawyer, in deciding the case, said: "The Land Department in this very case, as in cases of patents to preëmptioners, homestead claimants and other purchasers of the public lands, have acted, and, I think, correctly, upon the idea that patents to lands not known to be mineral lands at the time the patent issued, carry the title to all mines subsequently discovered in the lands, not-

withstanding the reservation from sale of mineral lands in the
acts of Congress.  By the words 'mineral lands' must be under-
stood lands known to be such, or which there is satisfactory
reason to believe are such, at the time of the grant or patent.
And the United States courts, which have had occasion to act
upon this subject, so far as I am aware, have adopted that idea.
*Pacific Coast Mining & Milling Co.* v. *Spargo*, 8 Sawyer, 645.
There must be some point of time, when the character of the
land must be finally determined, and, for the interest of all con-
cerned, there can be no better point to determine this question,
than at the time of issuing the patent.  The Supreme Court
has not yet had occasion to decide the point as to the effect
on a patent of a discovery of a valuable mine in lands sub-
sequently to the issue of a patent.  Any other construction
would be disastrous in the extreme to the holders of lands in
California under United States patents.  If land, which a
party has actually occupied, possessed and peacefully enjoyed
for a long series of years, claiming title under a patent of the
United States fifteen years old, can be entered upon and pros-
pected for a mine by any trespasser who chooses to do so, and
a mine being found, the mine can be located, and taken out of
the patent on the vague and uncertain exception in the patent
in question, it can be done fifty, or a hundred years hence,
and the patent instead of being a muniment of title upon
which the patentee, or his grantees can rest in security, would
be but a delusion, and a snare."

In *United States* v. *Reed*, 12 Sawyer, 99, 104, before the
Circuit Court for the District of Oregon, a bill was filed by
the United States to set aside a patent issued upon a home-
stead entry on the ground that the land was mineral and not
agricultural, and was at the date of entry more valuable for
mining than for agricultural purposes, and was so to the knowl-
edge of the patentee.  Judge Deady, in disposing of the ques-
tion, said : " The nature and extent of the deposit of precious
metals which will make a tract of land ' mineral,' or constitute
a ' mine ' thereon, within the meaning of the statute, has not
been judicially determined.  Attention is called to the ques-
tion in *McLaughlin* v. *United States*, 107 U. S. 526, but no

opinion is expressed. The Land Department appears to have adopted a rule, that if the land is worth more for agriculture than mining, it is not mineral land, although it may contain some measure of gold or silver; and the bill in this case is drawn on that theory of the law. In my judgment, this is the only practicable rule of decision that can be applied to the subject. Nor can account be taken in the application of this rule, of profits that would or might result from mining under other and more favorable conditions and circumstances than those which actually exist or may be produced or expected in the ordinary course of such a pursuit or adventure on the land in question."

In *Dughi* v. *Harkins*, 2 Land Dec. 721, which was before the Interior Department in November, 1883, there was a contest between mineral and agricultural claimants, the land having been returned as agricultural by the surveyor general. In disposing of it the Secretary, Mr. Teller, in a communication to the commissioner of the General Land Office, said: "The burden of proof is therefore upon the mineral claimant, and he must show, not that neighboring or adjoining lands are mineral in character, or that that in dispute may hereafter by possibility develop minerals in such quantity as will establish its mineral rather than its agricultural character, but that, as a present fact, it is mineral in character; and this must appear from actual production of mineral, and not from any theory that it may produce it; in other words, it is fact and not theory which must control your office in deciding upon the character of this class of lands. Nor is it sufficient that the mineral claimant shows that the land is of little agricultural value. He must show affirmatively, in order to establish his claim, that the mineral value of the land is greater than its agricultural value."

In the *Case of Samuel W. Spong*, 5 Land Dec. 193, which was before the Department of the Interior in October, 1886, similar views were expressed. An application had been made by Spong to the local land officers for the Marble Valley quartz mine, in the Sacramento district, in California, which was refused by them, for the reason that the section of land

containing the mine had been previously patented to the Central Pacific Railroad Company. On appeal, the Commissioner of the General Land Office affirmed the ruling, upon the ground that " the exception in the grant to said company and in said patent is construed to mean lands *known* to contain valuable minerals prior to the issuing of the patent, and that subsequent discoveries would not affect the title of the company to the lands and mines subsequently discovered." The case being taken to the Interior Department this decision was affirmed. In his opinion Mr. Lamar, who had succeeded Mr. Teller as Secretary of the Interior, said : " It is strenuously insisted by counsel for the appellant, that Congress did not grant mineral lands to said company ; that said patent, although including said section in terms, did not operate as a conveyance of the title to any land that may at any time be found to be mineral. It is not denied that said section was returned as agricultural by the United States surveyor ; that it was regularly patented to said company, without fraud or mistake on the part of the land officers or said company, so far as is shown by the record. The issue of said patent was a determination by the proper tribunal that the lands covered by the patent were granted to said company, and hence, under the proviso of said act, were not mineral at the date of the issuance of said patent."

In *Cleghorn* v. *Bird*, 4 Land Dec. 478, and in *Commissioners of Kings Co.* v. *Alexander*, 5 Id. 126, Mr. Secretary Lamar followed the decision of Secretary Teller in *Dughi* v. *Harkins*, and in repeated cases afterwards it was not only referred to by him with approval, but also by his successor in the department, Mr. Secretary Vilas.

Rulings to the same effect upon applications for mineral patents are found in decisions of the department for many years. They are that such applications should not be granted unless the existence of mineral in such quantities as would justify expenditure in the effort to obtain it is established as a present fact. If mineral patents will not be issued unless the mineral exist in sufficient quantity to render the land more valuable for mining than for other purposes, which can only be

known by development or exploration, it should follow that the land may be patented for other purposes if that fact does not appear.

See to this purport the following decisions of the Interior Department : *Magalia Gold Mining Co.* v. *Ferguson*, 6 Land Dec. 218; *Nicholas Abercrombie*, 6 Id. 393 ; *John Downs*, 7 Id. 71 ; *Cutting* v. *Reininghaus*, 7 Id. 265 ; *Creswell Mining Co.* v. *Johnson*, 8 Id. 440 ; *Thomas J. Laney*, 9 Id. 83.

It would seem from this uniform construction of that department of the government specially intrusted with supervision of proceedings required for the alienation of the public lands, including those that embrace minerals, and also of the courts of the mining States, federal and state, whose attention has been called to the subject, that the exception of mineral lands from grant in the acts of Congress should be considered to apply only to such lands as were at the time of the grant known to be so valuable for their minerals as to justify expenditure for their extraction.  The grant or patent, when issued, would thus be held to carry with it the determination of the proper authorities that the land patented was not subject to the exception stated.  There has been no direct adjudication upon this point by this court, but this conclusion is a legitimate inference from several of its decisions.  It was implied in the opinion in *Deffeback* v. *Hawke*, already referred to, and in the cases of the *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, 328, and *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 683.

In *Colorado Coal & Iron Company* v. *United States*, a bill was filed to set aside patents issued for agricultural lands, on the ground that it was known at the time of their issue that the lands contained mines of coal.  But the court said : " To constitute the exemption contemplated by the preëmption act under the head of 'known mines,' there should be upon the land ascertained coal deposits of such an extent and value as to make the land more valuable to be worked as a coal mine, under the conditions existing at the time, than for merely agricultural purposes.  The circumstance that there are surface indications of the existence of veins of coal does not constitute a mine.

It does not even prove that the land will ever be under any conditions sufficiently valuable on account of its coal deposits to be worked as a mine. A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of the sale. The question must be determined according to the facts in existence at the time of the sale. If upon the premises at that time there were not actual 'known mines,' capable of being profitably worked for their product, so as to make the land more valuable for mining than for agriculture, a title to them acquired under the preëmption act cannot be successfully assailed."

In *United States* v. *Iron Silver Mining Co.* a bill was filed to set aside certain patents on the ground that they were issued upon false representations that the land patented embraced only placer mining claims, and not any mineral veins or lodes; and the court said with reference to the uncertain proof on the subject: "It is not enough that there may have been some indications by outcroppings on the surface, of the existence of lodes or veins of rock in place bearing gold or silver or other metal, to justify their designation as 'known' veins or lodes. To meet that designation the lodes or veins must be clearly ascertained, and be of such extent as to render the land more valuable on that account, and justify their exploitation."

In connection with these views it is to be borne in mind also, that the object of the town-site act was to afford relief to the inhabitants of cities and towns upon the public lands, by giving title to the lands occupied by them, and thus induce them to erect suitable buildings for residence and business. Under such protection many towns have grown up on lands which, previously to the patent, were part of the public domain of the United States, with buildings of great value for residence, trade and manufactures. It would in many instances be a great impediment to the progress of such towns if the titles to the lots occupied by their inhabitants were subject to be overthrown by a subsequent discovery of mineral deposits under their surface. If their title would not protect them against a discovery

of mines in them, neither would it protect them against the invasion of their property for the purpose of exploring for mines.    The temptation to such exploration would be according to the suspected extent of the minerals, and being thus subject to indiscriminate invasion, the land would be to one having the title poor and valueless, just in proportion to the supposed richness and abundance of its products.    We do not think that any such results were contemplated by the act of Congress, or that any construction should be given to the provision in question which could lead to such results.    Our conclusion, as already substantially stated, is, that Congress only intended to preserve existing rights to known mines of gold, silver, cinnabar or copper, and to known mining claims and possessions, against any assertion of title to them by virtue of the conveyances received under the town-site act, and not to leave the titles of purchasers on the town sites to be disturbed by future discoveries.

In *Deffeback* v. *Hawke*, the mining patentee's rights antedated those of the occupants under the town-site law, and wherever such is the case his rights will be enforced against the pretensions of the town-site holder; but where the latter has acquired his rights in advance of the discovery of any mines and the initiation of proceedings for the acquisition of their title or possession, his rights will be deemed superior to those of the mining claimant.

It is not necessary in this case to state in what manner it must be shown that the existence of mines was known at the time the patent for the town site was issued.    If the mining patent states any initiatory steps in acquiring title which antedate the title of the town site, that may suffice in an action at law.    In the absence of such statement, the development and working of a mine would be a controlling fact; so also perhaps would be the location of the claim patented, and notice thereof required by law, or the custom of miners.    But in this case the patent does not show any such initiatory steps; it merely refers to the entry of the mining claim, and that was after the patent was issued to the town site.    No proof was offered to show when the mining claim was originally located; and it does not

appear that the want of it was made an objection to the plaintiff's recovery, except as that may be implied from the defendant's offer to prove that at the time the patent to the Butte town site was issued to the probate judge the premises embraced by the Gold Hill lode were not known to be valuable for minerals of any kind.    That proof was excluded on the ground that the ·mining patent to the plaintiff established that the premises contained valuable minerals.    Such was the effect of the patent, if there were any jurisdiction in the Land Department to issue a mining patent at all under the circumstances of this case.    Assuming for the present that there was jurisdiction, the question was not whether there were valuable minerals at the time that patent was issued, but whether such minerals were known to exist within the premises at the date of the town-site patent to the probate judge.    The plaintiff not having offered any proof upon this point, but having relied upon the fact as a matter of presumption merely, the defendant should have been permitted to establish the negative of it.    The absence of any proceedings required by law or the custom of the mining district to initiate a right to a mining claim, which he might perhaps have shown, would have been very persuasive that no mine was then known to exist. We think the court erred in excluding the proof of the defendant.

When the patent to the mining company was offered in evidence an objection was taken on the ground that the exception contained in it excluded all town lots from the grant, and it was necessary for the plaintiff to show that the property in controversy did not consist of lots thus excepted.    The exception in the patent went only to the exclusion of the lots from interfering with the surface of the land granted with the mining lode.    But we do not attach any importance to the exception, for the officers of the Land Department, being merely agents of the government, have no authority to insert in a patent any other terms than those of conveyance, with recitals showing compliance with the conditions which the law prescribes.    Could they insert clauses in patents at their own discretion they could limit or enlarge their effect without

warrant of law. The patent of a mining claim carries with it such rights to the land which includes the claim as the law confers, and no others, and these rights can neither be enlarged nor diminished by any reservations of the officers of the Land Department, resting for their fitness only upon the judgment of those officers. *Deffeback* v. *Hawke*, 115 U. S. 392, 406.

If after the introduction of the town-site patent and the deed to the defendant the objection had been raised to the jurisdiction of the Land Department to issue the patent in question for minerals in lands which had been previously conveyed to the defendant, a much more serious question would have been presented. The laws of Congress provide that valuable mineral deposits in lands of the United States shall be open to exploration and purchase. They do not provide, and never have provided, that such mineral deposits in lands which have ceased to be public, and become the property of private individuals, can be patented under any proceedings before the Land Department, or otherwise. Proceedings for the acquisition of title to a mining claim within a town site, commenced before the issue of a town-site patent, could undoubtedly be prosecuted to completion afterwards. The right initiated by the location of the mining claim would not be defeated by a subsequent conveyance of the title to the land in which the mining claim was situated. But it is not perceived where the jurisdiction exists under the laws of the United States to grant a patent for a mine on lands owned by private individuals — which was the case here — if the lots for which the defendant received a deed were included within the town-site patent and the location of the mining claim was subsequently made. Nor is there in this statement anything at all inconsistent with the decision of this court in *Steel* v. *Smelting Co.*, 106 U. S. 447. We stated there that land embraced within a town site on the public domain, when unoccupied, was not exempt from location and sale for mining purposes, and referred to the fact that some of the most valuable mines in the country were within the limits of incorporated cities, which had grown up on what was on its first settlement a part of the

public domain. We were speaking at that time of town sites for which no patent had been issued, and of mines in public lands; for, immediately after using these expressions, we said: "Whenever, therefore, mines are found in lands belonging to the United States, whether within or without town sites, they may be claimed and worked, provided existing rights of others, from prior occupation, are not interfered with."

It must be borne in mind also that town sites on the public domain in many instances, and probably in the greater part of them, embrace a much larger tract of country than is included in a patent for such town sites. The United States laws limit the quantity that shall be included within the patent of such a town site to the number of its inhabitants. Where there are over 100 and less than 200 inhabitants the patent can only embrace lands not exceeding 320 acres; where the inhabitants number more than 200 and less than 1000 it cannot embrace more than 640 acres; and where the inhabitants are 1000 or more it cannot exceed 1280 acres. For each additional thousand inhabitants, not exceeding 5000, a further grant of only 320 acres is allowed. Valuable mineral deposits in such lands outside of the patent are equally open to exploration and purchase as those in lands outside of the town site. It was in reference to mines in unoccupied public lands in unpatented town sites that the language in *Steel* v. *Smelting Co.* was used, and to them and to mines in public lands in patented town sites outside of the limits of the patent it is only applicable.

We agree to all that is urged by counsel as to the conclusiveness of the patents of the land department when assailed collaterally in actions at law. We have had occasion to assert their unassailability in such cases in the strongest terms, both in *Smelting Co.* v. *Kemp*, 104 U. S. 636, 640–646, and in *Steel* v. *Smelting Co.*, 106 U. S. 447, 451, 452. They are conclusive in such actions of all matters of fact necessary to their issue, where the department had jurisdiction to act upon such matters, and to determine them; but if the lands patented were not at the time public property, having been previously disposed of, or no provision had been made for their sale, or

other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the land, and their attempted conveyance by patent is inoperative and void, no matter with what seeming regularity the forms of law have been observed.

In the several cases to which we have been referred in the fifth and sixth Montana Reports, *Silver Bow Mining & Milling Co.* v. *Clark,* 5 Montana, 378 ; *Talbott* v. *King,* 6 Montana, 76 ; *Butte City Smoke-house Lode Cases,* 6 Montana, 397 ; which involved contests between parties claiming under mining patents and others claiming under town-site patents, and in which very able and learned opinions were given by the Supreme Court of the Territory of Montana, the mining claim patented had been located and the rights of the mining claimant had thus attached before the town-site patent was issued.  The patent which subsequently followed was a mere perfection of the right originated by the location, and to which it took effect by relation. It was held, in accordance with this opinion, that the prior mining location was not affected by the town-site entry.

It follows from the views expressed that the judgment of the Supreme Court of the Territory of Montana must be

*Reversed, and the cause remanded to the Supreme Court of the State, with directions to order a new trial in the proper trial court ; and it is so ordered.*