STATE OF NEVADA, Appellant, v. ELLISON RANCH-
ING COMPANY, a Nevada Corporation, Respondent.

No. 9208

November 18, 1977                    571 P.2d 394

*Robert List,* Attorney General, and *L. William Paul,* Deputy
Attorney General, Carson City, for Appellant.

*Vaughan, Hull, Marfisi & Miller, Ltd.,* Elko, for Respond-
ent.

## OPINION

*Per Curiam:*

Ellison Ranching Company, the respondent, brought this action to determine what interest, if any, the State of Nevada had in the gas, coal, oil, and other mineral rights of properties acquired in a state patent by Ellison's predecessors in interest. NRS 321.332, subsection 1.[1] The district judge ruled that the State had no such rights in the properties; hence this appeal.[2]

In 1864, the Congress granted to Nevada sections 16 and 36 of every township in the State. Nevada had the right to sell the land, providing the proceeds therefrom were used to support the public schools. Act of March 21, 1864, ch. 36, § 7, 13 Stat. 30, 32 (1864). Because much of the land proved unmarketable, Congress in 1880 granted, in lieu of the prior grant, two million acres of land that was to be selected from unappropriated, nonmineral public land.

---

[1]NRS 321.332(1):

1. Every person, corporation or association, his, her or its heirs, assigns or lawful successors referred to in NRS 321.331, who is entitled to any lands that may have been purchased by him, her or it, or his, her or its predecessors in interest, from the State of Nevada subsequent to March 3, 1887, or who has a separate estate in the minerals, including any gas, coal, oil and oil shales existing in such land, arising from a conveyance or reservation of mineral rights by such an immediate or remote grantee of the state, may bring an action in the district court of this state in and for any county where such lands or any part thereof are situate to determine by declaratory judgment of such court whether or not the State of Nevada has any rights to any minerals therein, including any oil, gas, coal and oil shales and, if possible, the extent thereof, and the State of Nevada hereby consents to the bringing of any such action or actions.

[2]The properties are located in Elko County and are described as follows:

TOWNSHIP 40 NORTH, RANGE 53 EAST, M.D.B.&M.:
Section 11: SW¼ SW¼; E½ SE¼
Section 12: NE¼ NW¼
Section 14: NE¼ SW¼
Section 22: SE¼ SE¼
Section 23: NW¼ NW ¼; SE¼ NW¼

TOWNSHIP 40 NORTH, RANGE 54 EAST, M.D.B.&M.:
Section 5: SE¼ SW¼
Section 6: Lots 7 and 10
Section 7: Lot 2; NW¼ NE¼
Section 8: SW¼ NE¼; N½ SW¼

Section 3 of the 1880 act provided that Nevada could pre-scribe laws governing the sale of the in-lieu lands. Act of June 16, 1880, ch. 245, § 3, 21 Stat. 287, 288 (1880). In 1887 Nevada did enact a statute declaring that all sales of land selected under the 1880 federal grant were subject to a reser-vation of "all mines of gold, silver, copper, lead, cinnabar and other valuable minerals that may exist in such land." Act of Mar. 3, 1887, ch. 103, § 2, 1887 Nev. Stats. at 103.[3] Nevada, in the Act of 1887, disclaimed any interest in those minerals and required persons desiring title to them to seek title from the federal government. This provision of the Act was predi-cated on Nevada's misconception that the grant had reserved the mineral right to the federal government.

The patents covering the lands the subject of this action were issued to respondent's predecessors in interest on August

---

[3]Act of Mar. 3, 1887, ch. 103, 1887 Nev. Stats. at 102–103 (§ 1, later NRS 516.010, was repealed by Act of March 27, 1969, ch. 175, § 2, 1969 Nev. Stats. at 248; § 2, later NRS 516.020, was repealed by Act of April 18, 1963, ch. 376, § 2, 1963 Nev. Stats. at 823):

SECTION 1. The several grants made by the United States to the State of Nevada reserved the mineral lands. Sales of such lands made by the State were made subject to such reservation. Any citizen of the United States, or person having declared his intention to become such, may enter upon any mineral lands in this State, notwithstanding the State's selection, and explore for gold, silver, copper, lead, cinnabar, or other valuable mineral, and upon the discovery of such valuable mineral may work and mine the same in pursuance of the local rules and regulations of the miners and the laws of the United States; *provided,* that after a person who has purchased land from the State has made valu-able improvements thereon, such improvements shall not be taken or injured without full compensation. But such improvement may be condemned for the uses and purposes of mining in like manner as private property is by law condemned and taken for public use. Mining for gold, silver, copper, lead, cinnabar, and other valuable mineral, is the paramount interest of this State, and is hereby declared to be a public use.

SEC. 2. Every contract, patent or deed hereafter made by this State, or the authorized agents thereof, shall contain a pro-vision expressly reserving all mines of gold, silver, copper, lead, cinnabar and other valuable minerals that may exist in such land, and *the State, for itself and its grantees, hereby disclaims any interest in mineral lands heretofore or hereafter selected by the State . . . on account of any grant from the United States. All persons desiring titles to mines upon lands which have been selected by the State, must obtain such title from the United States* under the laws of Congress, notwithstanding such selection. [Ellip-sis is for erroneous duplication of words amended out of this section by Act of Mar. 5, 1897, ch. 35, 1897 Nev. Stats. at 36.] [Emphasis added.]

16, 1916, and contained the following reservation, pursuant to the Act of 1887: "Provided that all mines of gold, silver, copper, lead, cinnabar and other valuable minerals which may exist in said tract are hereby expressly reserved."

In 1921, Nevada enacted a statute purporting to convey to all patentees of selected lands title to all minerals discovered therein, subject to royalties payable to State of five percent of the net proceeds of all gas, coal, and oil "mined or extracted therefrom."[4]

State contends that the reservation in the Act of 1887 and the patents issued pursuant to it included not only mines existing at the time the patents were issued, but also all minerals discovered anytime thereafter. State therefore argues that, since it retained those rights, the 1921 statute conscripting them to patentees subject to payment of royalties on the mined or extracted gas, coal, and oil is valid and binding upon respondent's properties.

The court below held that the reservation in the patents applied only to mines existing at the time the patents were issued. We agree. In Davis's Adm'r v. Weibbold, 139 U.S. 507, 517 (1891), certain land had been acquired by patent

---

[4]Act of Mar. 22, 1921, ch. 172, 1921 Nev. Stats. at 261 (now NRS 321.300):

SECTION 1. Every person, corporation, or association, his, her, or its heirs, assigns or lawful successors, who has a subsisting contract with the State of Nevada for the purchase of any lands of the State of Nevada or who may hereafter contract with the State of Nevada for the purchase of any of its public lands, and every patentee of lands purchased from the State of Nevada, shall, subject to the royalty provision hereinafter reserved, be deemed and held to have the right to the exclusive possession of the lands described in such contract, including all gas, coal, oil and oil shales that may exist in such lands; and every person, corporation, or association, his, her, or its heirs, assigns, or lawful successors, who has heretofore received or shall hereafter receive or be entitled to receive any patent or deed from this state granting to him, her or it any such lands, shall, subject to the royalty provision hereinafter reserved, be deemed to have the fee-simple title to the lands described in such patent or deed, including all gas, coal, oil and oil shales which may exist therein; *provided, however,* that any such contract holder or patentee shall pay to the State of Nevada for the fund which was the original beneficiary of such lands a royalty of five (5%) per cent of the net proceeds of all gas, coal, or oil mined or extracted therefrom.

SEC. 2. Nothing in this act contained shall be construed as impairing any rights heretofore acquired under existing laws to any such lands or rights therein.

SEC. 3. All acts or parts of acts in conflict herewith are hereby repealed.

pursuant to a statute declaring that "no title shall be acquired . . . to any mine of gold, silver, cinnabar or copper; or to any valid mining claim or possession held under existing laws." The court concluded that the patentee's entry of a mining claim after gaining title to the land did not deprive him of his title. While conceding that the statutory provision might be read as a reservation of all mineral rights, it noted that this was not its necessary meaning:

> [I]n strictness they import only that the provisions by which the title to the land in such town sites is transferred shall not be the means of passing a title also to mines of gold, silver, cinnabar or copper in the land, or to valid mining claims or possessions thereon. They are to be read in connection with the clause protecting existing rights to mineral veins; and with the qualification uniformly accompanying exceptions in acts of Congress of mineral lands from grant or sale. Thus read they must be held, we think, merely to prohibit the passage of title under the provisions of the town site laws to mines of gold, silver, cinnabar or copper, which are known to exist, on the issue of the town-site patent, and to mining claims and mining possessions, in respect to which such proceedings have been taken under the law or the custom of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth.

Davis's Adm'r v. Weibbold, 139 U.S. at 518–519.

State attempts to distinguish this case from *Weibbold* on the basis of language used in the statutes and patents. The 1887 Act reserved all mines that *may exist,* while the statute in *Weibbold* reserved mines *known to exist* at the time the patent has issued. State's argument is not well taken. The statute in *Weibbold* reserved "any mine . . . or . . . any . . . mining claim held under existing laws." This trivial difference from the language of the 1887 Act is insufficient to support significantly different interpretations.

We believe that if the Legislature had intended to impose the far-reaching limitation on the land patented it would have expressed an intention to do so. As noted in *Weibbold:*

> If land, which a party has actually occupied, possessed and peacefully enjoyed for a long series of years, claiming title under a patent of the United States fifteen years

old, can be entered upon and prospected for a mine by any trespasser who chooses to do so, and a mine being found, the mine can be located, and taken out of the patent on the vague and uncertain exception in the patent in question, it can be done fifty, or a hundred years hence, and the patent instead of being a muniment of title upon which the patentee, or his grantees can rest in security, would be but a delusion, and a snare.

Cowell v. Lammers, 10 Sawyer 246, 247, 21 F. 200 (D.C. Cir. 1884), as cited in Davis's Adm'r v. Weibbold, 139 U.S. at 521.

Since the language of the reservation can be reasonably construed only as reserving any mines existing at the time the patent was issued, the State had no rights to convey by the 1921 Act and no power to impose a royalty payment on its patentees. Therefore, the lower court was correct in declaring respondent to have sole rights to any gas, coal, and oil or other minerals which might be discovered in its land and to have no obligation to pay royalties on same to the State.

The judgment of the lower court is affirmed.