UNITED STATES v. DIAMOND COAL & COKE CO.

(Circuit Court of Appeals, Eighth Circuit. November 21, 1911.)

No. 3,286.

1. PUBLIC LANDS (§ 120*)—SUIT TO CANCEL PATENTS—FRAUDULENT ENTRY OF COAL LANDS.

Defendant, which was a coal company, purchased soldiers' additional homestead certificates calling for land to the amount of 2,800 acres paying therefor at the rate of from $6 to $13 per acre, and caused the same to be located on public land by two persons, each entryman making the required affidavit that he was well acquainted with the character, of the land, that his personal knowledge was such as to enable him to testify understandingly with regard to it, and that there was not to his knowledge within its limits any deposit of coal, but that it was essentially nonmineral, and acquired for agricultural purposes. The land was what is known as "sage brush and alkali land" in a rough mountainous country, and practically worthless for agricultural or grazing purposes. It lay on the western slope of a ridge, and in the valley adjoining and on the slope of such ridge, within a quarter of a mile of the nearest point of the land. was a well-known outcrop of veins of coal of high commercial grade, many miles in length north and south: the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

largest vein being from 6 to 14 feet in thickness, and all dipping to the westward. Defendant and another company were operating mines in such veins in the valley to the northward of these lands and a third company to the south of them, its workings extending to the line of one of the tracts, where they stopped in a vein 10 feet or more in thickness. The lands had for many years been regarded by general reputation as coal lands, and the year before one of the entrymen, who was manager of defendant's mines, had filed a declaratory coal statement on one of the tracks which he afterward abandoned; also at about the time of the entries defendant purchased a tract within half a mile of some of the entries which had been purchased as coal land from the government at $20 per acre, and had thereon an eight-foot vein. *Held*, that the evidence was sufficient to show that the land was coal land not subject to entry as agricultural land, and to entitle the United States to a cancellation of the patents as having been obtained by fraud.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

2. PUBLIC LANDS (§ 29*)—"COAL LANDS OF UNITED STATES"—EVIDENCE.

To constitute a tract of public land "coal lands of the United States" within the meaning of Rev. St. 2347 et seq. (U. S. Comp. St. 1901. p. 1440), which can only be acquired by purchase as therein provided, it is not essential that the presence of coal thereon in paying quantity should have been actually demonstrated, but consideration should be given to the proof of which the subject by its nature is susceptible, such as the known presence of coal in surrounding land, the visible exposure of outcrop and the surrounding geological formation, and it is sufficient if the land is generally regarded by the local public as having a special value for its coal contents beyond its value for agricultural or like purposes.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 41–47; Dec. Dig. § 29.*]

3. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENTS—EVIDENCE.

In a suit by the United States against a coal company for the cancellation of patents to public lands on the ground of fraud, in that, while in fact coal lands, they were acquired by defendant by the fraudulent location of agricultural scrip thereon, evidence that defendant had previously caused fraudulent homestead filings to be made on part of the land which were relinquished when the scrip locations were made was admissible to show the purpose of defendant to acquire the lands by illegal methods.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

Appeal from the Circuit Court of the United States for the District of Wyoming.

Suit in equity by the United States against the Diamond Coal & Coke Company. Decree for defendant, and complainant appeals. Reversed.

Following is the opinion of the Circuit Court by Lewis, District Judge:

The bill charges that on January 1st, 1900, complainants were the owners of certain described lands in Uinta County, Wyoming, comprising about 2,840 acres; that all of said lands were vacant, unreserved, unappropriated, and rough and broken in character and were then known coal lands, and were chiefly valuable as such; that said lands could only be legally entered and purchased in compliance with an act of Congress approved March 3rd, 1873, entitled "An Act to Provide for the Sale of Lands of the United States Containing Coal:" that the defendant at all times well knew said lands were

coal lands, and chiefly valuable as such, and could only be entered and acquired as coal lands; that defendant, through its officers and agents, well knowing the lands to be of the character aforesaid, entered into a fraudulent conspiracy with Thomas Sneddon and Daniel F. Harrison to acquire said lands from the complainants under the acts of February 13th, 1862, and August 18th, 1894, known as Soldiers' Additional Homestead Acts; that the defendant, in furtherance of said conspiracy, purchased through said Sneddon and Harrison soldiers' additional homestead scrip, entered and purchased said lands with said scrip, thereafter obtained patents therefor in the names of said Sneddon and Harrison, who thereupon conveyed by deeds said lands to the respondent company; in violation of the acts of Congress and in fraud of the complainants' rights. The bill thereupon prays that all of said patents be cancelled and that complainants have an accounting for all coal mined and taken from said lands.

The answer denies that said lands were coal lands and chiefly valuable as such at the time of purchase; alleges that said lands were grazing lands subject to entry and purchase in the manner charged in the bill; admits that Sneddon and Harrison entered and purchased the lands as charged in the bill, and says that said lands were properly and legally acquired under the acts of Congress (sections 2304–2306, Rev. Stats. U. S.), and that at the time said lands were entered they were not known to be valuable for mineral and coal deposits, and the only known value of the lands at that time was for agricultural and grazing purposes, and were subject to entry under the Homestead Laws, and particularly the laws relating to the acquisition of title by soldiers' additional homestead entries; denies that the defendant, or its officers or agents, knew that the lands or any portion thereof were known coal lands; denies that they were coal lands within the meaning of the Coal Land Act; denies the conspiracy and confederation charged in the bill; denies that there was any intent or purpose on the part of defendant, Sneddon or Harrison to fraudulently obtain said lands, and denies all other charges in the bill to the effect that Sneddon or Harrison or the defendant attempted or desired to obtain the lands from complainants in any manner other than as required by the acts of Congress and alleges that it purchased the lands from Sneddon and Harrison for a valuable consideration, and alleges that the lands, and all thereof, were legally and properly acquired, and that defendant is vested with an indefeasible title thereto. The answer admits that defendant is engaged in mining in Uinta County, Wyoming, in the vicinity of the land described in the bill, but denies that any of said lands are being mined for coal or that any coal has been mined from said lands.

### The Evidence.

1. A map was offered in evidence showing the location of the lands in question and the outcrop of the coal vein in question easterly therefrom, a copy of which follows:

The shaded portions of the foregoing map show the lands involved in this suit. (More than half the lands lie more than a mile from the line of the outcrop, and the nearest lands are several hundred feet away.) The outcrop runs along the westerly side of an elevation known as Oyster Ridge. This ridge is said to resemble what is commonly known as foot-hills. The lands in question lie in a valley to the west of the outcrop, the valley extending westerly in varying width from six to twelve miles to another ridge or range of what may be called foot-hills. These ridges, with the valley between varying in width from six to twelve miles, are said to extend northerly and southerly for some fifty or sixty miles. The coal vein disclosed by the outcrop dips to the west, its angle of inclination from the horizontal is said to be about seventeen degrees in the vicinity of the most southerly lands in question. and about twenty-five degrees in the vicinity of the most northerly lands in question, and assuming the vein to be continuous it would, on its dip, penetrate under all the lands in question. The outcrop does not consist of a section of the vein rising above the surface of the ridge. Along sections of its strike there is nothing whatever to indicate its presence. At other places it is traced by what is known as the "blossom," i. e. particles of coal mixed with and scattered throughout the wash. Mines have been successfully operated on the vein indicated by the outcrop some two or three miles northerly of the most northerly tract in question, and southerly from and near to the most southerly tract in question. These mines were opened up by following down on the outcrop, but the overburden became so great, on account of insufficient roof, at a perpendicular depth of eight to nine hundred feet that successful mining could not be continued to further depth. These mining operations, both to the north and the south, disclosed that "wants" in the vein are not unusual. The mines to the north disclosed a "want" extending with the strike of the vein for twelve hundred (1,200) feet, and the ones to the south disclosed one more than six thousand (6,000) feet long, notwithstanding the indications on the outcrop above these "wants" gave promising indications of coal beneath. By a "want" is meant a section of the vein barren of mineral, that is to say, the vein, consisting of the two walls and the crevice between, exists, but the filling is composed of nonmineral substance, such as sand, gravel and rock. At the times the lands were entered and at the times patents were issued there were no indications whatever on any of the lands in question that coal existed in them. No coal has ever been mined from any of these lands. Several years after patents were issued mining operations on other lands were extended up to the easterly end line of the North Half (½) of the Southeast Quarter (S. E. ¼) of Section Eighteen (18), Township Nineteen (19) Range One Hundred and Sixteen (116), exposing a vein of merchantable coal on the east end of said eighty acres. This coal, however, was not known to exist until long after the issuance of patents. No prospecting, by way of drilling or otherwise, has ever been done on any of the lands for the purpose of determining whether coal may be found therein. In view of this uncontradicted and undisputed showing of fact the complainants have rested their whole case upon the testimony of one Veatch, a geologist in the service of the U. S. Geological Survey. He testified only as an expert and he gave it as his opinion that coal would be found at some depth under the surface of all of the lands in question. This opinion was based upon the hypothesis that the vein indicated on the outcrop would continue in its dip to the west until it passed under these lands, and that it would bear coal throughout its dip. He also ventured an opinion as to the depth the vein might be found under these lands, and this opinion was based on the assumption that the angle of dip from the horizontal would continue to be substantially the same as disclosed in workings to the north and to the south of the lands in question. On this theory he placed the vein under the lands nearest the outcrop at a depth of about nine hundred feet and on the lands farthest from the outcrop at a depth of three thousand or more feet. I am unable to believe that any such testimony is worthy of serious consideration for the purpose of sustaining the issue tendered by the bill. None of these lands were ever noted on complainants' public surveys and plats as coal lands.

2. The evidence further clearly shows that the lands in question, at times of entry and patent, produced some nutritious grasses which gave them some value as grazing lands; in fact, so far as knowledge on the part of any one then extended as to their character and quality, they were then valuable for that purpose only, and such has been their condition ever since, barring the face of coal on the east end of the eighty in section 18 above referred to, which was not exposed and its existence not known until many years after all patents had been issued.

Under the foregoing facts the substantial charge in the bill to the effect that the lands in question were at the time of purchase known coal lands and chiefly valuable as such, stands wholly unsupported,—indeed is entirely disproved. Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182; Ghost v. U. S. (8th Circuit Court of Appeals) 168 Fed. 841, 94 C. C. A. 253.

3. But other facts were adduced in evidence on which complainants' counsel appear to chiefly rest their contention for the relief prayed. And those facts are these: Some years prior to the purchase of the lands by Sneddon and Harrison a part of the lands in controversy were entered under the Homestead Act, cheap dwellings were constructed upon each entry, and the different homestead entrymen pretended to take possession and for a while live upon their respective entries, for the ostensible purpose of complying with the Homestead Act. It is insisted that the proof shows that those homestead entrymen made their entries and took possession under hire from the defendant, with an agreement to obtain patent for the use and benefit of the defendant and to thereafter convey their respective entries to the defendant; that the buildings so constructed thereon were made at the expense of the defendant, from lumber furnished by the defendant, and that thereafter the defendant, in recognition of its obligations to said entrymen, paid them monies in discharge thereof. But the proof further shows conclusively and without contradiction that none of these homestead entries went to patent, but that they were all relinquished by the entrymen to complainants. The defendant contends that these entries were not made under its direction or for its benefit. Such conduct on the part of defendant, if true, would have been a fraud on the government and title taken by any one with knowledge of such facts would have been invalid as against complainants. Inasmuch, however, as all such entries were subsequently released and cancelled and purchase of the lands thereafter made under soldiers' additional homestead scrip, it is unnecessary to consider such testimony and determine the character of such transactions as to whether they be fraudulent or otherwise, and whether or not the defendant was a party thereto, if fraudulent. Such acts became no part of the transaction between complainants and those who subsequently acquired the lands under soldiers' additional homestead scrip. These alleged fraudulent acts were no inducement to the complainants in parting with their title in consideration of the surrender of the soldiers' scrip. Fraud without damage is not actionable. Ming v. Woolfolk, 116 U. S. 599, 6 Sup. Ct. 489, 29 L. Ed. 740; Marshall v. Hubbard, 117 U. S. 415, 6 Sup. Ct. 806, 29 L. Ed. 919; 2 Pomeroy's Equity Jurisprudence, §§ 879, 880, 890.

In 2 Chitty on Contracts (11th Am. Ed.) p. 1036, it is said: "But a court of equity will not rescind a contract on the ground of fraud * * * unless it appear that the contract was based on the misrepresentations complained of." To which principle many cases are cited. The proof wholly fails to sustain the bill. It will therefore be dismissed. It is so ordered.

Timothy F. Burke, U. S. Atty., and Marsden C. Burch, Sp. Asst. Atty. Gen., for the United States.

L. O. Evans and C. F. Kelley (B. M. Ausherman, on the brief), for appellee.

Before VAN DEVANTER and HOOK, Circuit Judges, and CARLAND, District Judge.

HOOK, Circuit Judge. [1] This is a suit by the government to cancel patents issued to Thomas Sneddon and Daniel F. Harrison and their subsequent deeds to the appellee the Diamond Coal & Coke Company for about 2,840 acres of land in Uinta county, Wyo. The ground of the suit is that Sneddon and Harrison, at the instance and instigation of the company and for its benefit, fraudulently procured the patents from the United States by false affidavits and representations that the lands were nonmineral agricultural lands containing no deposits of coal, and were therefore subject to entry under the homestead laws, whereas in truth they were known to be mineral in character. contained large deposits of coal, were chiefly valuable as such, and were not subject to acquisition in the manner adopted by the company and its agents. Upon final hearing the trial court dismissed the government's bill, and this appeal followed.

The entries of the lands were made by Sneddon and Harrison with soldiers' additional homestead rights, which being transferable under the acts of Congress had been purchased by the company. The acquisition of "coal lands of the United States" had long been the subject of special statutory restrictions as to the persons who were entitled to purchase, the quantity which might be purchased and the price to be paid. Rev. Stat. §§ 2347, 2348, 2350 (U. S. Comp. St. 1901, pp. 1440–1441). The details of these restrictions need not be set out. It is sufficient to say that coal lands were not subject to homestead entry, and, if the lands in controversy were of that character, neither the company nor Sneddon and Harrison could in any lawful way have acquired from the government such a quantity nor indeed any except a limited amount by purchase at a minimum cost of $10 or $20 per acre according to proximity to a completed railroad. Sneddon and Harrison as preliminary to each entry were required to make and did make affidavit of their personal knowledge, not upon information and belief, as to the character of the lands involved. Upon these affidavits the government officials acted. Each of the entrymen swore that he was well acquainted with the character of the land described, having frequently passed over it; that his personal knowledge of the land was such as to enable him to testify understandingly with regard to it; that there was not to his knowledge within its limits any vein or lode of certain specified minerals "or any deposit of coal"; that it was "essentially nonmineral land"; and that his application was "not made for the purpose of fraudulently obtaining title to the mineral land, but with the object of securing said land for agricultural purposes." The proofs show conclusively that, although the company in purchasing the soldiers' additional homestead rights paid therefor at the rate of from $6 to $13 per acre, the lands upon which they were located were almost worthless for agricultural purposes. They were in a rough, broken, and mountainous country, unfenced, unfarmed, and of a character known as "sagebrush and alkali land" for which water for irrigation purposes was difficult if not impossible of procurement. For grazing purposes the lands were worth not to exceed a dollar per acre. There was substantial testimony that the value did not exceed half that sum. The

lands lie along the slope and in the valley west of what is known as Oyster Ridge,. a range of hills about 40 miles in length and of an elevation of about 7,000 feet above sea level. About half way down the western slope of the ridge there was an. outcrop of veins of coal, the line of which extended in a northeasterly and southwesterly direction for a distance of many miles. The outcrop, though weathered down in places and in others covered by the wash from above, was well defined and traceable. The largest vein appearing at the outcrop was from 6 to 14 feet in·thickness, and was of a high commercial grade of coal. It dipped in sheet or blanket formation to the westward at an angle varying from 15 to 30 degrees. All of the lands in controversy are west of the line of outcrop and lie above the plane of the dip of the vein. Some of them approach to within a few hundred feet of the outcrop. The others are of varying distances, the east line of the most westerly section being less than a mile and a half away. A valley three or four miles in width separates Oyster Ridge from another range of hills in which is probably the largest vein of coal in the United States. It is, however, of lignite and of no commercial value at present. It is referred to here simply to illustrate further the general character of the country. Most of the applications for entries by Sneddon and Harrison were made in three days in May and June, 1899. The others were made in subsequent years. when the character and value of the lands were even more apparent. About 25 years previously, when the survey of the west slope of Oyster Ridge was made, coal was encountered in ·places where the lines were run. For many years prior to the entries in 1899, the lands along the ridge and in the valley west of the outcrop were generally regarded as coal lands by people living in that section of Wyoming. Such was their general reputation. As early as 1887 people attracted· by the evidences of coal began making cash coal entries upon lands west of the line of outcrop. Many coal declaratory statements ·were also filed, some as early as 1882, though few, if any of them, proceeded. to final entry. In 1898, the year prior to the location of the soldiers' additional homestead rights upon the lands in controversy, Sneddon, then in the service of the defendant company, suggested to a county official that they have lands in that immediate locality taken up by homesteaders and then sell them to some coal company. He believed there was coal in the land, and that money could be made by the venture. In April, 1898, Sneddon, who had investigated the land and knew of the coal outcrop, caused a survey to be made locating the section corners and lines of lands and the lines run embraced part of those in controversy. When this was done, he was with the surveyors most of the time, and by his direction particular attention was given to the presence of coal and to the running of lines to include it. A few days.afterwards Sneddon said to the chainman at the survey that he wished to acquire certain indicated parcels of the "coal land" "before the Cumberland people could get it," and that "they would put some homestead entries on them in order to keep the Cumberland people from getting them." The Cumberland people, so called, owned coal properties south of

the lands of defendant and those in controversy. On March 28, 1898, Sneddon filed in the land office a sworn statement declaring his intention to purchase under the laws of the United States relating to the sale of coal lands a tract of 160 acres, the southeast corner of which is but little more than a quarter of a mile from the line of the coal outcrop. He swore that he took possession of the land October 1, 1897, and that it contained large deposits of coal, and was chiefly valuable therefor. But this method of getting title was abandoned. Sneddon afterwards secured a patent from the United States for the benefit of his company by locating a soldiers' additional homestead right thereon and making the nonmineral affidavit that there was not to his knowledge within the limits of the land any deposit of coal, and that his object was to secure "said land for agricultural purposes." Counsel for the company contend that Sneddon's first or cash entry was due to an error in the description of the land, and for proof they refer to the testimony of two witnesses whom they name. But these witnesses said they knew nothing about it, and Sneddon did not testify, although shown to be an officer of the company at the time. This tract of land is one of those in suit, and not long afterwards the company located its mining town but little more than a quarter of a mile away.

About the time Sneddon and Harrison made most of the locations which are being attacked, possibly in August, 1899, one James Lees made a cash coal entry on a quarter section near the south end of the land in controversy. There was an eight-foot vein of coal on it. The purchase price from the government was $3,200, and by a deed dated August 26, 1899, Lees conveyed the land to the defendant company for the recited consideration of $3,400. The line of coal outcrop runs through this land. A corner of an entire section in controversy is a half mile north of it, and on the south and west are two 80-acre tracts as near. In 1894, five years before the entries in controversy were made, the defendant company commenced mining on the outcrop north of the lands in suit. Official reports by public officers show a small output for the years 1894 and 1895. No report appears for the year 1896, but for 1897 it showed 183,000 tons; 1898, 259,000 tons; and 1899, the year in which the entries in question were made by Sneddon and Harrison, 441,000 tons.

Supplementing the external evidences of an underlying body of coal in substantial measure and of commercial quality and value is the testimony of a geologist connected with the geological survey as to the geological formation of the immediate surrounding country and the significance of external appearances. This testimony is criticised by counsel for the company, but an intelligent, scientific reading of such things in connection with an actual mineral outcrop is frequently all there is preceding extensive investment, and practical men are accustomed to rely upon it in their enterprises. Following fast upon the acquisition of the lands in suit as agricultural lands came the development of the country as a coal-bearing section. Before the testimony in this case was taken, three companies had opened up and operated nine mines on twenty miles of the line of outcrop.

To the northward were three mines of the Kemmerer Coal Company, then three of the defendant, and at the south three Cumberland mines, so called, of the Union Pacific Coal Company, the most important concern of its kind in Wyoming. The mines of each group were approximately from a mile and a half to two and a half miles apart. Two and a half miles intervened between the south Kemmerer mine and the north mine of defendant, and six miles between defendant's south mine and the most northerly Cumberland. This last-mentioned mine was worked up to the very line of the most southerly of the tracts of land in controversy, where, when further progress in that direction was barred, the vein of coal disclosed was from 10 to 15 feet in thickness. Millions of tons of coal have been taken from these mines. There were times in which they were producing over 8,000 tons per day. The defendant reported to a state board an output from its mines of 528,000 tons for the year 1905. In the winter and spring of 1900–1901 a railroad 18 miles in length was constructed from a connection with the Oregon Short Line southward to serve the Cumberland mines. We need not stop to define the precise limit of the bearing of these subsequent operations and developments as evidence upon the question whether the lands in suit were coal lands when they were acquired from the United States as agricultural.

[2] The defendant gives a number of reasons for its position that the lands in suit are not coal lands. It says, which is true, there is no evidence upon their surface of coal contents. The long line of outcrop lies to the eastward. It also says that the only way to determine with the certainty required by law is to explore with a drill, and that has not been done. One of defendant's principal witnesses testified that, in the absence of an actual outcrop of coal, a tract of land should be laid out in thousand foot squares and a hole drilled with a diamond drill to the requisite depth at each corner. He also said that in the case here the cost would be prohibitive. His contention was, and it is substantially that of defendant, that land cannot be regarded as coal land unless coal is actually exposed naturally or artificially. In other words, at the time it is acquired from the United States, there must be either a natural outcrop or an actual disclosure by the work of man. Visible evidences of coal veins upon adjacent lands and geological probabilities, however strong, as to the lands in question, will not suffice. We have already referred to the most southerly of the tracts in suit, and to the fact that the workings in one of the Cumberland mines drove up to the line of it and stopped in a vein of coal ten or more feet thick. Concerning this, the witness mentioned testified that should the Cumberland drift or incline be in good coal up to three inches of the property line the land beyond should not be called coal land—this because of the possibility of a barren coal measure behind the three-inch intervening wall. It is also contended that, even if the veins of coal shown at the outcrop were known to be continuous on their downward dip to the west, it would be impracticable for any one who did not own the outcrop to mine under most of the lands in suit; also, even with ownership of the outcrop, the depth by following down the angle of the dip would be too great for

mining. Again, it is said the lands are not in a solid body, but are too small and too widely separated for profitable mining. This argument was applied by one of defendant's-witnesses to the most southerly of the tracts in suit. It contains 80 acres, and, though the Cumberland workings showed almost with certainty that it contains a large body of coal, it is about 1,000 feet away from the line of outcrop. So it was said the tract was too small to justify mining through vertical shafts sunk on the land itself, and to mine by means of an incline from the outcrop involved either trespass or an arrangement with another coal company which owned the intervening land. Three of the tracts in controversy are entire sections. The smallest, two in number, contain 80 acres each, and they connect at corners. Finally, it is urged that the coal veins lack continuity both on their strike and their dip, and that it cannot be told in the absence of actual exploration that there is coal under any particular piece of land in quantity or quality to justify mining. There are "wants" in the line of outcrop; that is to say, an absence of coal from the bed or measure where it should be found, some extending considerable distances. Similar barren areas are found in the underground workings of the mines, also places where the coal veins are thin, others where interstratifications and impurities occur and where the roof or floor between which the coal lies is of a character to impede or prevent mining. All the uncertainties and difficulties of mining in this field are pointed out. Indeed, as urged, they amount to a condemnation in general of the practical value of the coal deposits of the West, which being found in cretaceous formations, instead of belonging to the older carboniferous geological epoch as those of Pennsylvania and other eastern states, are said to be much more irregular and less uniform and continuous. Yet, if the acts of Congress are to have application to the extensive coal deposits in the western mountainous regions outside the very land in which they outcrop and without exploration by the government by diamond drill at excessive if not prohibitive cost, there must be a more liberal view than that advanced in this case by defendant. It would be anomalous if lands could be acquired from the United States as nonmineral, agricultural lands, and at once be held, dealt in, and sold upon the basis of a coal-bearing character resting upon satisfactory proof. The construction of the old statutes exempting "known mines and salines" from homestead entry and pre-emption has little bearing here. The terms "mineral lands," "lands valuable for minerals," and "coal lands" which were later ingrafted upon the body of laws relating to the public lands have a broader meaning. The purpose of Congress is manifest to withdraw from disposition except under particular restrictions those limited areas of the public domain which in general opinion based upon substantial evidence have a special value for mineral contents beyond that arising from their adaptation to agricultural or other like uses.

True, the mineral character of the land must be known at the time of the grant, and the mineral must be in such quantities as to justify exploitation (Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed. 238) ; but that does not mean a positive, absolute cer-

tainty which can only be shown by actual exposure or uncovering, nor that temporary distance from market makes unprofitable the mining of any but a very thick vein or deposit. In the first place, regard should be had to the proof of which the subject by its nature is susceptible, and that proof certainly comprises visible exposure of outcrop, the dip of vein and surrounding geological conformations. Veins of precious minerals are notoriously more uncertain in extent, continuity and uniformity than deposits of coal, but it could hardly be said that one might acquire by homestead entry land adjacent to a valuable mining claim and towards which a known vein of gold or silver dipped upon the supposition that the vein might "pinch out" or become unprofitable to follow. Again, Congress considered distance from market and all which that implies by its gradation of prices of coal lands according to distance from railroads.

We have here an extensive coal deposit of commercial value; the outcrop line, though barren in places, being easily traced or discoverable. The dip of the coal veins was known. Surrounding geological formations showed that, though subject to "wants" and irregularities, they extended under the lands in question. The lands were of little agricultural value, but they had a much greater value because of the belief in their coal contents founded on evidences upon which men in the business were accustomed to rely. We think the lands were coal lands within the laws of the United States, and that defendant sought to acquire them as such. Defendant gives as a reason for its acquisition of the lands at a cost many times their value for agricultural or grazing purposes that it is important in coal mining on a large scale to have as much of the surrounding property as possible for townsites, railroads, etc., and that it is not desirable to have others located in proximity to its operations. But this reason is not persuasive. It does not adequately explain the coincidence that all the tracts in question lie west of the known line of coal outcrop, over the veins on their westward dip, and that they follow the direction of the outcrop north and south for a distance of nearly seven miles.

[3.] Considerable evidence was received of fraudulent homestead entries of the lands in controversy made at the instance of the defendant in 1898, the year prior to the location of the soldiers' additional homestead rights under which it finally obtained patents. The circumstances connected with them may properly be considered not as directly invalidating the patents now held, but as evidence of a purpose to acquire the lands by illegal methods. The entries of 1898 connect with the entries of 1899 in point of time. The former were relinquished at defendant's instance and most of the latter were immediately made. This matter, in more detail, is as follows: Shortly after the survey of part of the lands at the instance of Sneddon in the spring of 1898 and running into July of that year homestead entries were made covering at least 800 acres of the land in controversy, some of which were by employés of the defendant. The lands embraced in other like entries were not identified in the evidence, but were in that immediate region. The direct and circumstantial evidence and the deductions reasonably to be made show we think beyond all question that Sneddon instigated this homestead movement

for the defendant, and that it was intended for its benefit and advantage. We do not overlook the fact that there was a short interval during which he was not in defendant's service. Just when it was does not clearly appear, but the interest of defendant in the homestead entries is shown beyond reasonable doubt. Shortly after the entries were made small frame cabins of cheap construction were built without cost to the entrymen. In some instances the lumber and other building materials came from defendant's store; in others it was not shown where they came from, but the entrymen did not know who furnished or paid for them. One contractor built a number of cabins where he found the lumber piled, and received his compensation from defendant's cashier at its office. Such testimony as there was showed that the entrymen did not reside on their lands. A particular instance of this is the case of Gove, the chainman at Sneddon's survey. Sneddon asked him if he would take a homestead, and he said he would. Shortly afterwards, at Sneddon's suggestion, he went to the land office with others and filed his declaratory statement. His expenses and the land office fees were paid by a man who Sneddon said would attend to them. The land Gove entered is part of that in controversy, and is in the section furthest removed from the line of coal outcrop. A house was built on his claim, but he did not know who paid for it. He slept in the house two nights—once when caught in a storm and once when hunting. Some time afterwards an attorney acting for defendant told him the company wished him to relinquish his claim. He went to Burrell, the general manager, verified what the attorney told him, and signed a relinquishment. Later he was paid $500 by a check of the defendant. There is considerable testimony that at first it was understood the entrymen were to receive $9 per acre for the land, and some testified directly that the defendant was to pay it. Burrell, the general manager and Sneddon's superior, knew of and participated in some of the transactions. Sneddon finally informed some of the entrymen that their entries were invalid, and he advised them to relinquish them. They did so, and soldiers' additional homestead rights were at once used by defendant in acquiring title. Under these settlement and residence on the lands were not required. A number of entrymen were afterwards paid by defendant $500 each; in one case $600. There is unmistakable proof that the homestead venture of 1898 was an illegal device for the purpose of either holding the lands temporarily or fraudulently securing title for the benefit of the company, and, if the latter, the attempt was abandoned when other means of getting title were at hand. In all the cases the homestead entrymen were required to swear that the lands were nonmineral. In some instances those who testified substantially admitted they swore falsely. In others they relied upon the absence of surface indications of coal contents. As we have said, there was such a connection between this attempt, though abandoned, and the later effort that the former may be regarded as evidence of a purpose persisted in to acquire the lands fraudulently.

The decree is reversed and the cause is remanded, with direction to enter one for the complainant as prayed for.