UNITED STATES v. KOSTELAK et al.

(District Court, D. Montana. August 4, 1913.)

No. 249.

1. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENT—FRAUDULENT ENTRY—"MINERAL LAND."

When fraud is alleged to procure the cancellation of a patent to land entered as agricultural but claimed to be mineral land, it must be proved that at the time of final entry it was known to contain minerals in sufficient quantity to justify the expectation that it could be profitably developed and worked and that by reason thereof the land is more valuable therefor than for agricultural uses.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*

For other definitions, see Words and Phrases, vol. 5, pp. 4515, 4516.]

2. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENT—HOMESTEAD ENTRY OF MINERAL LAND.

Evidence considered, and *held* not to sustain a suit by the government for cancellation of a patent issued on a homestead entry on the ground that the land was known as coal land, it being shown that, while it had once been withdrawn from homestead entry on that ground, it was afterward restored and was several years afterward entered as a homestead in good faith by defendant who resided upon, improved, and cultivated it for the full five years before making final proof, making no effort to develop it for coal, which was done at the expenditure of considerable time and expense by a tenant to whom he gave a mining lease two years later; that while surrounding lands had been exploited for coal by men of experience and means for 20 years, but few paying mines had been found and many prospect developments had been abandoned, including one on the land in suit made 20 years before defendant's entry.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

3. MINES AND MINERALS (§ 2*)—MINERAL CHARACTER OF LAND—EVIDENCE.

To attach mineral character to public lands it is not sufficient to demonstrate that adjacent lands are mineral in character. Outcroppings on the land itself are more or less evidentiary, but by no means conclusive, of its mineral character, and off the land their value as evidence rapidly lessens.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2; Dec. Dig. § 2.*]

In Equity. Suit by the United States against John Kostelak and others. Decree for defendants.

J. W. Freeman, U. S. Atty., and S. C. Ford, Asst. U. S. Atty., both of Helena, Mont., and Geo. W. Wickersham, U. S. Atty. Gen.

Cooper & Stephenson, of Great Falls, Mont., for defendants.

BOURQUIN, District Judge. This is a suit to cancel a patent for 160 acres of land issued upon a homestead entry upon the ground of fraud in that, when final proof and entry were made, the land was not valuable for agricultural purposes and was mineral land chiefly valuable for the coal therein, and that to the knowledge of the entryman. The defenses are denials.

The original homestead entry was made by the defendant John Kostelak on April 1, 1901; five-year final proof and final entry were

made in June, 1906, and patent issued November 2, 1906. The bill was filed herein June 7, 1912, and the testimony taken before the court April 2, 1913. The issue of bona fide purchaser is not involved. The patentee fully performed all the conditions precedent to homestead patent.

The land is four 40-acre legal subdivisions which in form are an inverted "T." It is a fairly level "bench"; the north "forty" being penetrated from the west by a broad coulee 160 feet lower than the bench at the west line and gradually rising to the level of the bench at the east line.

In 1881 the vicinity was being first settled. An adjoining settler drove a tunnel about 75 feet long on the north 40 of said land; the mouth being about 500 feet southeasterly from the northwest corner thereof and about 40 feet above the floor of said coulee. This tunnel trended northeasterly and disclosed five or six feet of coal vein cropping in blanket form. The government's inspectors testify the croppings are about five feet thick midway of the tunnel, two or three feet thick at the face of the tunnel, with six inches of bone or slate on top, and that because of dirt on the floor of the tunnel they did not see the bottom of the coal seam. When the tunnel was driven, some of the coal was burned by the settler and some others; wood for fuel being distant 20 miles. About two years later the settler sold his claim and abandoned the tunnel and from that day to this the tunnel continued abandoned. No other work of any kind was done upon this land in suit for coal mining purposes until near two years subsequent to the aforesaid final entry of defendant Kostelak. About 1882 two tunnels trending southerly and several hundred feet in length were driven into the same bench and about three-fourths of a mile northeasterly of the land in suit. The coal disclosed therein was very poor, principally slate; some was burned by settlers; and both tunnels were abandoned and have since so continued. In 1886 the Sand Coulee main mine was opened about two miles southwest of the tunnel upon the land in suit and across a coulee, though on a bench of the same elevation, which mine was operated profitably until 1897 when it was practically worked out. In 1887 the Dean mine was opened about one-fourth mile from the said Sand Coulee mine and in the direction of the land in suit, which seems to have been and is being operated more or less continuously.

In 1885 a railway company prospected near the land in suit, sinking drill holes. One was sunk about one-fourth mile east of the northeast corner of the north 40 of the land in suit, another was sunk very close to the south line thereof, neither of which found coal, and another was sunk near the northeast corner of the east 40 and found no workable coal. No development followed. No coal croppings existed on the land in suit save in the tunnel aforesaid prior to Kostelak's final entry. Blackened earth on the surface inspired said tunnel, and the coal croppings were found therein. They were fairly typical of those found generally throughout the locality and which on development might or might not lead to good and profitable coal. The land in suit is without what mining men take to be the main coal basin, and likelihood of croppings under such circumstances leading to good and

profitable coal was and is doubted. At the time of final entry the agricultural value of the land was not great; like land being there procurable at from $2.50 to $8 per acre. The entryman was a cigar maker and followed his trade upon the land. He made the home of himself and family, consisting of his wife and their seven to ten children, on the land for about six years and until about six months after patent issued. His improvements, stock, cultivation, and crops were substantial. In the vicinity other lands were like improved and cultivated, and this land in suit compared favorably therewith in all agricultural respects. To briefly note the history of the land as disclosed by the records of the government land office, it appears that in 1888 the township including this land was withdrawn from agricultural entries for that a departmental special agent had reported large bodies of coal therein. In 1889 this withdrawal was revoked save as to several sections, including section 7, and within which is this land, and in 1891 the revocation was extended to all thereof. Prior to 1888 lands adjoining the land in suit on the south and east had been sold by the government as coal land, and in 1883, 1896, and 1901, lands adjoining the land in suit on the north, west, and south were sold by the government as agricultural lands.

Taking section 7 as the center of a township, about 2,500 acres thereof have been entered and patented as coal land, and about 21,000 acres thereof have been entered and patented as agricultural land. All coal entries are of bench lands, and all agricultural entries are of coulee and bench lands. Prior to defendant's entry of the land in suit, it had been entered as agricultural land and abandoned. The agricultural possibilities of the locality were in a measure unknown until a few years prior to the final entry involved but have steadily appreciated until values have increased in instances fivefold; the bench lands having proven more valuable for agriculture than the coulee or bottom lands.

At some indefinite time a profitable coal mine (Brown's new mine) has been opened about one-half mile south of this land. Likewise, at the southwest corner of this land, a tunnel has been driven in the direction of the land and practically to its south line, wherein was found some very poor coal, and the tunnel was abandoned.

The locality has had railway facilities since long prior to the final entry involved. Until within "a very few years" it was almost impossible for small coal operators "any distance from the railroad track" and because of rates and the large operators to "make any money."

Defendant Kostelak says he knew before final entry that there was a prospect hole on the land (the tunnel), but it was somewhat caved and he did not enter it and knew nothing of coal therein. (He is taken to know all that might have been known by inspection, however.) In his final proof he testified there were no indications of coal on the land. The officer before whom final proof was submitted testified at this trial that Kostelak told him that there was "an old abandoned prospect hole" on the land, and no more; so it was written in the proof that there were no indications of coal on the land. In April, 1908, 2 years after the final entry and 18 months after patent, Kos-

telak leased the land for coal mining purposes to defendant Lochray for a term of 20 years. Kostelak then conveyed the land to his wife, and she likewise leased it to Lochray for a term of 15 years. Lochray had been a coal operator in the locality from about 1886 and was familiar with the land, having been in the tunnel in 1884 and thereafter. He commenced development on the south side of the coulee, exhausted his resources, then organized a company and transferred his lease to it. It continued development, extending to both sides of said coulee, and finally opened up valuable coal in about one-half of the said north 40 and mostly on the south side of the coulee. The workings are practically confined to said north 40, though entries disclose that the coal extends into the adjoining 40 south. Many thousands tons of coal have been mined from the land. These, in brief, are the facts.

[1] The law applicable may be summarized thus: So long as public lands are on the market and so open to entry and sale, they are of but two classes, mineral lands and nonmineral lands. In the West the former can be legally entered under only the mineral land laws; the latter under only the nonmineral or what may be broadly termed the agricultural land laws. The former must measure up to a certain standard (that is, known to contain minerals in sufficient quantity to serve as the foundation of reasonable hopes and expectations that development will disclose minerals in paying quantities), and that by reason thereof the land is more valuable therefor than it is for agricultural uses. The latter have no standard. Though lands are practically valueless for agricultural uses, yet, if they do not attain the foregoing standard for mineral lands, they fall into the class of nonmineral lands and can be entered under only the agricultural land laws and by any one who will in good faith perform the conditions precedent to patent, whatever they may be. When fraud is alleged to procure the cancellation of a patent, the land alleged to be mineral land must be proven to have been known to be mineral, as above defined, at the time of final entry and sale.

A patent issued is evidence that the lands conveyed are of the class appropriate to the patent. It is a written public grant of the highest character, is solemn and high evidence of its own validity, and, out of respect for it and the necessity for stability of titles evidenced by it, it cannot be set aside for alleged fraud unless the allegations thereof are sustained by clear, strong, unequivocal, and convincing proof— proof, in quantity and quality, which commands respect and produces conviction. See Davis, Adm'r, v. Weibbold, 139 U. S. 522, 11 Sup. Ct. 628, 35 L. Ed. 238, and cases cited.

[2] In view of the facts and the law, the court is of the opinion that the allegations of the bill of complaint are not proven and it will be dismissed.

When the final proof and entry involved were made in 1906, the locality, not greatly noted for coal at any time, had been exploited for coal by men and organizations of means and experience and who *knew* coal for about 20 years. Upon this land was only a prospect tunnel disclosing coal croppings (the deteriorated vein or indications of a vein next to the surface of the earth), and which had been aban-

doned about 24 years. The croppings poor when first exposed, from the deteriorating influences of exposure and time, must have appeared less promising from day to day. Prospecting north, east, and south and adjacent to this land had failed to find any or workable coal. No workable coal had been found, developed, or mined save at a point about two miles southwest of this land, which latter was without the main coal basin and was not considered favorable for coal. Like croppings even in a more favorable location might or might not indicate workable coal beyond them. Some adjoining land had been entered as coal land, but the record is barren of evidence of even indications of coal thereon. More adjoining land had been entered as nonmineral or agricultural land, and there is evidence of its value therefor. The government withdrew this land from agricultural entry and classified it coal land, and later and long prior to the entry involved revoked the withdrawal. No one seemed to value it for coal sufficiently to prospect it further or to seek title to it as coal land, but an earlier agricultural entry was made thereon and abandoned. It was left to Kostelak to finally labor to create it a home for a large family. His good faith, if material, is evident. He did not seek title in 14 months after original entry, as he might, but complied with the requirements of the law for full five years prior to final proof and continued residence thereon for one year thereafter. Even then there is no indication that he or any one valued it for coal. He moved away from the locality, and not until one year later and 18 months after patent is a lease for coal mining purposes made to Lochray. Lochray, an experienced coal operator, leases instead of buying, giving opportunity to develop without loss of a purchase price if development resulted in nothing.

Success did not immediately follow development. Lochray exhausted his resources and then sought aid. Later coal of value was developed and mined, and this suit filed about four months before the bar of the statute had fallen. It is safe to say that, but for this successful development by Lochray and his grantee, this suit would not have materialized. It is clearly a case of knowledge after the event. In reference to the croppings in the tunnel upon this land, they indicated the possibility of coal in the lesser half of one 40. If the tunnel on its course would soon encounter workable coal, about 14 acres of coal might lie to the north of it. There was nothing to indicate coal on the balance of the 160 acres. The best the government's inspectors can say for the croppings aforesaid is that they are what they "would call a very good crop coal; it wasn't first-class coal by any means, but still it was a coal that you could reasonably expect to burn and probably get along very nicely with it if you didn't have any other; it was very fair crop coal. * * * After you *have gone into it a little farther* you *could determine* as to what the coal would *probably* make; * * * a very favorable showing would warrant a man going ahead and prospecting it thoroughly." And one of them says that in his opinion the land is undoubtedly more valuable for the coal it contains than for any other purpose. All of which is true; but since they testified in the light of inspections made in 1911 and 1912, when valuable coal had been developed, and testified in present

tense, based on present conditions, it falls far short of proof that at the time of final entry in 1906, the vital time, the land was coal mineral land as hereinbefore defined. In view of the history of the locality and the land prior to final entry in 1906, then conditions, knowledge of, and experience in the locality, the prospecting upon and adjacent to the land involved and the results thereof, there then may have been a possibility but not a reasonable probability that further development would result in the discovery of workable and valuable coal deposits within this land and because of which probability the land was then more·valuable therefor than for agricultural uses.

The cases of the United States v. Diamond Coal & Coke Co., 191 Fed. 786, 112 C. C. A. 272, has been urged in support of a contrary conclusion. With all due respect for the eminent court that determined said case, this court cannot accept its construction and application of the law. In said case involving many different entries and patents, it is determined that where an extensive exposure or cropping of a large and valuable blanket coal vein exists in instances as much as two miles from legal subdivision of certain lands and entirely off said land but dipping towards said lands, upon which latter are no evidence of coal, and geological conditions are said by experts to be such that in their opinion the veins continue uninterrupted on their dip and extend under said lands, the said lands, not reserved but on the market and open to entry, are coal lands, mineral in class, enterable only as such and not enterable as nonmineral or agricultural lands, and if entered and patented under nonmineral or agricultural laws the patents are unlawful and to be set aside for fraud. It is believed that this is a construction and application of the law not warranted and never before arrived at by any court nor by the land department of the United States in its practical administration of the public lands. See Davis, Adm'r, v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed. 238, and cases cited.

[3] Outcroppings of mineral upon certain land· are more or less evidentiary but by no means conclusive of its mineral character, and off the land their value as evidence rapidly lessens. The mountains of the West and the adjacent valleys and plains are ribbed with mineral vein outcroppings. They indicate possibilities or probabilities of valuable mineral deposits, but they are only indications. The country is pockmarked with prospect holes upon them. Some resolve these possibilities into realities and disclose valuable minerals, but far more fail therein, so that it is a common and truthful saying, born of costly and sad experience, that but one prospect in a thousand warrants development and unearths mineral deposits of value. Lands of great agricultural value and devoted solely to agricultural uses often contain these croppings of no value. The distance any vein may continue is notoriously uncertain, and presumptions are to be cautiously indulged. This is illustrated by Dahl v. Raunheim, 132 U. S. 263, 10 Sup. Ct. 74, 33 L. Ed. 324, wherein it is held that a vein of quartz exposed 200 or 300 feet without the boundaries of.a placer claim and trending in the direction of said claim, as would appear from the record in said case, is not presumed to extend within it. Contrary to the doubt expressed in the Diamond Coal & Coke Case, nonmineral or agricultural

entries are lawful and commonly made of lands of little or no agricultural worth and adjacent to valuable operating mines but which lands are not known to contain minerals of value.

Such nonmineral or agricultural homestead entries of lands have been made and patented adjoining the world-famous Pennsylvania, Rarus, Matt, and other mines of Butte, lands towards which the veins or lodes of said mines in a measure strike and also dip, and so made and patented after the government records showed said mines patented and after the great value of said mines was common knowledge. Section 2337, R. S. (U. S. Comp. St. 1901, p. 1436), is further congressional recognition that land near but not contiguous to known veins or lodes may be nonmineral and enterable as such. If it contains no known valuable mineral deposits, it falls into the nonmineral or agricultural class, however rich in minerals are the adjacent lands. To attach mineral character to lands, it is not sufficient to demonstrate that adjacent lands are mineral in character. It is everyday practice for the land department to survey and divide a single 40-acre legal subdivision or smaller tract into mineral land, known to contain valuable deposits of mineral, and into nonmineral or agricultural land, not known to contain valuable deposits of mineral though containing croppings or other indications thereof. If presumption is to be indulged that a vein or lode extends under lands two miles distant from the outcroppings, why not five, ten, or an indefinite number of miles; where will be the limit and how and by whom will it be determined? It may be believed a vein or lode so extends, but belief is not the required knowledge.

To the argument that, unless these beliefs, speculations, presumptions are indulged, the government by nonmineral or agricultural entry may be unlawfully deprived of lands that time and development may prove to contain valuable mineral deposits may be responded that conditions at the time of entry and sale govern; that, if the lands are placed on the market, and at entry and sale are not known to contain such deposits, a nonmineral or agricultural entry is the only lawful entry that can be made thereon; it is not unlawful deprivation but lawful sale; and, if time and development should discover mineral deposits of the greatest value therein, that is the good fortune of the entryman at which the government nor any can cavil. Furthermore, if the government desires to retain to itself the possibilities of mineral deposits of value, Congress can legislate to that end that lands containing any indications of minerals shall be classed as and entered and sold as mineral lands, or that as provided by Acts June 22, 1910, c. 318, 36 Stat. 583 (U. S. Comp. St. Supp. 1911, p. 614), the surface may be entered under nonmineral laws, the coal, if any, being reserved, or the land department can withdraw such lands from nonmineral or agricultural entry, even as it did the land here involved, and, if it is believed the geological conditions are such that valuable deposits may exist therein, can maintain the withdrawal until time and development determine. Thus full protection will be afforded to the government. Undoubtedly such withdrawal should have been timely made in reference to at least some of the lands involved in the Diamond Coal & Coke Case. In weighing the decision of the court therein, however,

let it be remembered this was not done. But so long as the law is as it is, and so long as the lands are not withdrawn from but left on the market and open to entry and sale, they are legally enterable under the nonmineral or agricultural land laws, though worthless for agricultural uses, if not mineral lands as hereinbefore defined. And so entered under such circumstances, no mere mineral indications, beliefs, hopes, speculations, presumptions, no belated precaution by withdrawal from market, nor the realities of subsequent development can lawfully destroy the vested right created by such nonmineral or agricultural entry.

If the Diamond Coal & Coke Case be contemplated in reverse, it is believed present error will be apparent. Let it be supposed that the entries involved were coal mineral entries. It can be only a supposition, for, in view of the facts, the law and the land department must and would have classed the lands as nonmineral or agricultural lands, and coal mineral entries would not have been allowed therefor. Since absolutely no coal had been developed upon the lands, the proofs required precedent to coal mineral entry could not be made; and neither the law nor the land department permits such entries to be made without satisfactory evidence of the developed and known mineral character of the land merely because the land is otherwise worthless, and a would-be entryman has faith inspired by geological conditions that distant veins or lodes extend under the land, and he is willing to pay a large price therefor. The latter is a minor consideration and not an inducement, and a higher price will not legalize an entry and sale of nonmineral or agricultural lands under the mineral laws. But, if the proofs precedent to coal mineral entries had been furnished and coal mineral entries made and patents issued, the entries would unquestionably have been founded upon perjury and fraud, and the said case would still have been one to cancel the patents for fraud, not, however, to cancel nonmineral or agricultural patents for fraud in that the lands were mineral in character, but to cancel coal mineral patents for fraud in that the lands were nonmineral or agricultural in character, with decree as now for complainants. And it is a safe hazard that there would have been a busy session of the federal grand jury of the district of the lands returning true bills against the entrymen guilty of such glaring and transparent perjury, as would clearly have been involved under the facts and circumstances disclosed in said case, in making the sworn proofs required precedent to coal mineral entries of known deposits of valuable coal in said lands. It may be pointed out that, though lands have little or no agricultural value and are sought in the hope and belief that time and development will disclose valuable deposits of mineral therein and are sought for that reason and purpose, if not mineral lands as hereinbefore defined they can be lawfully entered only as nonmineral or agricultural lands and can be so entered under any of what are commonly termed "scrip" entries, of which the entries involved in the Diamond Coal & Coke Case are one variety. Such hopes, beliefs, purposes are not material to the issue of fraud alleged in cases like unto the Diamond Coal & Coke Case, at least not unless the known mineral character of the land involved at the time of final entry is otherwise proven. If lands are

mineral, the entryman's good faith will not legalize his nonmineral entry thereof; and, if they are nonmineral, his bad faith will not illegalize his nonmineral entry thereof—transform their character to that of mineral lands.

The court finds that the lands in suit were not known at the time of Kostelak's final entry to be valuable for the minerals therein and more valuable therefor than for agricultural uses, and a decree accordingly will be entered for defendants.