**EMPIRE STAR MINES CO., Limited, v. GRASS VALLEY BULLION MINES et al.**

**No. 8669.**

Circuit Court of Appeals, Ninth Circuit.

Oct. 12, 1938.

Robert M. Searls and Wm. E. Colby, both of San Francisco, Cal., and John P. Gray, of Coeur d'Alene, Idaho, for appellant.

Charles W. Slack, Edgar T. Zook, Joseph C. Meyerstein, and Grant H. Smith, all of San Francisco, Cal., for appellees.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

MATHEWS, Circuit Judge.

On and prior to February 21, 1933, and at all times thereafter, appellant, Empire Star Mines Company Limited, a Delaware corporation (hereafter called plaintiff), was the owner, entitled to possession and in actual possession of three lode mining claims, the Daisy Hill, the Gold Run and the Arcturus, mineral patents for which were issued by the

United States to plaintiff's predecessors in title on July 22, 1895, December 13, 1906, and October 5, 1931, respectively. These claims are in the northwest quarter of section 1, township 15 north, range 8 east, Mt. Diablo Meridian, in Nevada County, California.

On July 25, 1933, and at all times thereafter, Grass Valley Bullion Mines, a California corporation (hereafter called Grass Valley), was in actual possession of a tract of land (hereafter called the Galena tract) in lot 7 of the northeast quarter[1] of section 2, township and range aforesaid. From a point on the surface of the Galena tract, a shaft known as the Bullion shaft extends, in a downward and northeasterly direction, past the northeasterly side line of the Galena tract, into and through adjacent ground not here involved, thence into and through the Gold Run claim and thence into the Arcturus claim. From this shaft, drifts extend into all three of plaintiff's claims.

On or about July 1, 1934, by means of the shaft and drifts mentioned above, Grass Valley, without plaintiff's consent and despite its objections, entered upon, or into, plaintiff's claims, commenced mining and extracting ores from a vein or lode situated vertically beneath the surface thereof, and has since continued so to do.

On October 5, 1934, plaintiff brought this suit against Grass Valley and ten other defendants to quiet plaintiff's title to the Daisy Hill, Gold Run and Arcturus claims; to enjoin defendants from mining or extracting ores therefrom or from any vein or lode situated vertically beneath the surface thereof; for an accounting as to the quantity and value of ores so mined and extracted by defendants, and for damages. Defendants other than Grass Valley were E. J. DeSabla, Jr., L. J. DeSabla, Joseph C. Meyerstein and Frank P. Webster, citizens of California, as trustees for the creditors and stockholders of Bullion Consolidated Gold Mining Company, a dissolved California corporation (hereafter called Bullion Consolidated);[2] Idaho Maryland Mines Corporation,[3] a Nevada corporation (hereafter called Idaho Maryland); and F. W. McNear, S. A. Stephens, E. A. Wiltsee, Errol MacBoyle and Harold Frederic Lynn, citizens of California.

Answers were filed by all the defendants. All except Grass Valley and the trustees deny having mined or extracted any ores from plaintiff's claims or from any vein or lode situated vertically beneath the surface thereof.

Grass Valley and the trustees admit that, under and by virtue of an agreement with the trustees, Grass Valley has mined and extracted ores from a vein situated vertically beneath the surface of plaintiff's claims, but deny that said vein is a part of said claims or either of them. They allege that said vein has its apex in the Galena tract, which, in Grass Valley's answer, is called the Galena mining claim and, in the trustees' answer, is called the Galena Gold Quartz mining claim; that said vein is commonly known as the Galena or Bullion vein and is part of the Galena tract; that a mineral patent for the Galena tract was issued to the heirs of William Watt and Robert Watt (the trustees' predecessors in title) on May 24, 1933;[4] and that the trustees thereby became, and were at the time of filing their answer, the owners of said tract. Subsequently, on October 31, 1936, they conveyed all their right, title and interest to Grass Valley.

Plaintiff filed a reply reading, in part, as follows: "* * * Plaintiff admits that on or about the 24th day of May, 1933, the Commissioner of the General Land Office of the United States of America issued and delivered to the attorney for defendant trustees what purported to be a mineral patent running to 'the heirs of William Watt and Robert Watt,' covering the [Galena tract]. Plaintiff denies, however, that said purported patent was in fact a patent from the United States of America to 'the heirs of William Watt and Robert Watt,' or that said patent had any validity whatever, or that the Commissioner of the General Land Office had any legal authority or jurisdiction on said date or at any other time since the 30th day of December 1882, to issue a

---

[1] Being a "fractional" quarter section, the northeast quarter of section 2 is subdivided into lots instead of quarters.

[2] Bullion Consolidated was dissolved on March 1, 1927. Thereupon, its directors became trustees for its creditors and stockholders. California Civil Code (1923), § 400.

[3] Substituted for Idaho Maryland Mines Company.

[4] The Galena patent was, in fact, issued on May 19, 1933.

mineral patent to said [Galena tract]. In this behalf plaintiff further alleges that all of said [Galena tract] was embraced within an agricultural location made on the 28th day of February, 1872, by one Thomas M. Paine[5] under Agricultural College Scrip * * *; that thereafter and on the 30th day of December, 1882, said location was approved and a patent thereon issued to said Thomas M. Paine, and ever since said 30th day of December, 1882, said [Galena tract] has been and now is embraced within a valid agricultural patent, and never since said last mentioned date has been or now is subject to disposition under the mining laws of the United States. * * *"

At the hearing below, the Galena patent was introduced in evidence. It is the usual form of mineral patent. It purports to grant the Galena tract[6] and all veins and lodes, throughout their entire depth, the tops or apexes of which lie inside of the surface boundary lines of said tract extended downward vertically, although such veins or lodes in their downward course may so far depart from a perpendicular as to extend outside the vertical side lines of said tract.[7] Thus the patent purports to grant what are commonly called extralateral rights.

The trial court held the Galena patent valid; found, as a fact, that the vein or lode from which Grass Valley has mined and extracted ore beneath the surface of plaintiff's claims is the Galena or Bullion vein or lode, and has its apex in the Galena tract; and decreed that plaintiff's ownership of the Daisy Hill, Gold Run and Arcturus claims is subject to the right of Grass Valley "to pursue the Galena or Bullion vein or lode on its downward course underneath the surface of plaintiff's said properties wherever said lode is found to enter into, penetrate and underlie the said properties of the plaintiff within and between two vertical planes extended easterly indefinitely, the southern-most plane being drawn at right angles to the general course of the apex of the lode through the said Galena [tract][8] from the point on the south end line where said apex crosses said line * * * and a northerly parallel end plane passed through the north end line of said [tract], where the apex of the vein or lode crosses the same."

The decree enjoined Grass Valley from entering upon any portion of the surface of plaintiff's claims or upon any portion of the subsurface thereof "save and except in the exercise of the right of said defendant to pursue the said Galena or Bullion vein or lode on its downward course underneath the surface of said plaintiff's property within the vertical planes hereinbefore defined;" awarded damages to plaintiff in the sum of $978.69, being the net proceeds of ore found by the court to have been mined and extracted by Grass Valley beneath the surface of plaintiff's Gold Run claim beyond the north "extralateral right plane" of the Galena tract; and dismissed the suit as against all other defendants.

Plaintiff has appealed.

The question is whether, in so far as it purports to grant veins or lodes situated vertically beneath the surface of plaintiff's claims, the Galena patent is void or valid.

On and prior to August 29, 1867, the Galena tract was a part of the public domain, as was also the land embraced in what are now the Daisy Hill, Gold Run and Arcturus claims. The Galena tract remained a part of the public domain until December 30, 1882, the Daisy Hill claim until July 22, 1895, the Gold Run until December 13, 1906, and the Arcturus until October 5, 1931.

On August 29, 1867, William Watt and Robert Watt filed in the local land office at Marysville, California, a diagram of a tract of land which they called the Galena Company mining claim, but which was

[5] The locator's name was, in fact, Thomas N. Paine.

[6] The patent purports to grant a tract of land (hereafter called lot 43) in sections 1 and 2, township and range aforesaid, excepting and excluding, however, the part embraced in the Bullion and La Bruja mining claims. The excluded part (hereafter called the Bullion tract) is the only part of lot 43 that is or ever was in section 1. The rest—the part which the patent purports to grant—is in section 2, and is the tract which, in this opinion, is called the Galena tract. In the patent, the Galena tract is called the Galena Gold Quartz mining claim.

[7] Subject, however, to the provisions of § 3 of the Act of May 10, 1872, c. 152, 17 Stat. 91 (R.S. § 2322, 30 U.S.C.A. § 26), hereinafter quoted.

[8] In the decree, the Galena tract is called the Galena Gold Quartz mining claim.

subsequently designated, and is hereafter called, lot 43. Lot 43 consists of the Galena tract in lot 7 of the northeast quarter of section 2 and an adjoining tract (hereafter called the Bullion tract) in the northwest quarter of section 1, township and range aforesaid. With the diagram, the Watts filed a petition—sometimes, in the record, erroneously called an application for patent—requesting the Register of the land office to publish a notice of their intention to apply for a patent for lot 43 under the Act of July 26, 1866, c. 262, 14 Stat. 251 (hereafter called the Act of 1866).[9]

The Register does not appear to have published or posted any notice of the Watts' intention to apply for a patent. He did publish in a newspaper and post in his office for 90 days, between August 29, 1867, and December 7, 1867, a notice that the Galena Mining Company intended to apply for a patent, and that any person claiming adversely to the Galena Mining Company must file notice of such adverse claim within three months. Who or what the Galena Mining Company was or is, the record does not show.

Lot 43 was surveyed on December 29, 1868. On March 6, 1872, the United States Surveyor General for California approved the survey and, on March 8, 1872, transmitted a plat thereof to the local land office at Sacramento, California.[10]

The filing of the diagram and petition in 1867 and of the plat in 1872 did not constitute an application for patent. These were but preliminary steps to that end. The final step was to enter lot 43 and pay the purchase price thereof. The Watts did not take that final step and, consequently, did not, in fact, apply for a patent until March 24, 1887.

Meanwhile, much else had occurred.

On November 28, 1870, Thomas N. Paine filed in the Sacramento land office his declaratory statement (No. 2169) alleging settlement December 28, 1859, on lot 7 of the northeast quarter of section 2, and claiming the right of preemption to said lot, including the Galena tract, under the Act of March 3, 1853, c. 145, § 6, 10 Stat. 246, and amendments thereof.[11]

On February 28, 1872, Paine changed

---

[9] Sections 2 and 3 of the Act of 1866 provided:

"Sec. 2. * * * That whenever any person or association of persons claim a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper, having previously occupied and improved the same according to the local custom or rules of miners in the district where the same is situated, and having expended in actual labor and improvements thereon an amount of not less than one thousand dollars, and in regard to whose possession there is no controversy or opposing claim, it shall and may be lawful for said claimant or association of claimants to file in the local land office a diagram of the same, so extended laterally or otherwise as to conform to the local laws, customs, and rules of miners, and to enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein or lode with its dips, angles, and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition.

"Sec. 3. * * * That upon the filing of the diagram as provided in the second section of this act, and posting the same in a conspicuous place on the claim, together with a notice of intention to apply for a patent, the register of the land

office shall publish a notice of the same in a newspaper published nearest to the location of said claim, and shall also post such notice in his office for the period of ninety days; and after the expiration of said period, if no adverse claim shall have been filed, it shall be the duty of the surveyor-general, upon application of the party, to survey the premises and make a plat thereof, indorsed with his approval, designating the number and description of the location, the value of the labor and improvements, and the character of the vein exposed; and upon the payment to the proper officer of five dollars per acre, together with the cost of such survey, plat, and notice, and giving satisfactory evidence that said diagram and notice have been posted on the claim during said period of ninety days, the register of the land office shall transmit to the general land office said plat, survey, and description; and a patent shall issue for the same thereupon. * * *"

[10] It appears that, at some time between August 29, 1867, and March 8, 1872, records pertaining to the lands here in question were transferred from Marysville to Sacramento.

[11] Act of March 1, 1854, c. 17, 10 Stat. 268; Act of May 30, 1862, c. 86, § 7, 12 Stat. 410.

his preemption claim to a Texas scrip location; that is, he located on lot 7 and other land not here involved Agricultural College scrip (General Land Office scrip No. 902) issued to and assigned by the State of Texas, pursuant to the Act of July 2, 1862, c. 130, 12 Stat. 503, and amendments thereof, 7 U.S.C.A. § 301 et seq.[12] Paine's scrip location was approved and, on December 30, 1882, a patent was issued to him for all of lot 7, including the Galena tract.

The patent to Paine was an agricultural patent. It did not grant or purport to grant extralateral rights. If, as claimed by defendants, there was a vein or lode having its apex in the Galena tract, the United States granted to Paine only so much thereof as was situated vertically beneath the surface of said tract. The part, if any, of such vein or lode situated vertically beneath the surface of what are now plaintiff's claims remained, as before, the property of the United States.

The Act of 1866, in so far as it defined the rights of locators of lode mining claims and prescribed the procedure for obtaining patents for such claims, was superseded by the Act of May 10, 1872, c. 152, 17 Stat. 91 (hereafter called the Act of 1872),[13] but § 16 of the Act of 1872, 30 U.S.C.A. § 47, provided that nothing contained in that act should be construed to impair, in any way, rights or interests in mining property acquired under existing laws.

On March 24, 1887, more than four years after patent had issued to Paine,

Robert Watt and the heirs of William Watt[14] entered lot 43, which they then called the Galena Gold Quartz mining claim, and paid the Receiver of the Sacramento land office $30 ($5 an acre) as the purchase price thereof. On November 6, 1889, the Commissioner of the General Land Office suspended this mineral entry (No. 1166), and, in a letter to the Register and Receiver of the Sacramento land office, stated:

"* * * It clearly appears * * * that the issuance of the patent to Mr. Paine upon his scrip location including the ground in conflict with [lot 43], was an error into which this office was led by erroneous diagrams furnished by the surveyor general.

"If the owners, under the patent issued to Paine, will surrender it to this office, with a request that it be canceled, and another one issued excluding [the Galena tract], this office will execute such request, and thereupon, this mineral entry may be adjusted upon its merits.

"If, on the other hand the rightful owners under the patent will not surrender it for the purposes aforementioned, then an application by the mineral claimants for institution of a suit in the name of the United States to set aside and vacate said patent to the extent of the conflict with [lot 43], will be carefully considered by this office."

A letter to the same effect was sent by the Commissioner to the mineral claimants' attorney on November 9, 1889. The

[12] Act of July 23, 1866, c. 209, 14 Stat. 208, 7 U.S.C.A. § 305; Act of July 27, 1868, c. 256, 15 Stat. 227, 43 U.S.C.A. § 867; Act of July 1, 1870, c. 196, 16 Stat. 186; Act of March 3, 1871, c. 126, 16 Stat. 581.

[13] Section 3 of the Act of 1872 (R.S. § 2322, 30 U.S.C.A. § 26), provides: "That the locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists at the passage of this act, so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with said laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their

entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of said surface locations: Provided, That their right of possession to such outside parts of said veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as aforesaid, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of said veins or ledges: And provided further, That nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

[14] William Watt died on July 6, 1878.

Commissioner's suggestion was not complied with. The Paine patent was not surrendered, nor was any request made for institution of a suit to vacate or set aside the patent, nor was any such suit ever brought. The time within which such a suit might have been brought expired on March 3, 1896. Act of March 3, 1891, c. 561, § 8,[15] 26 Stat. 1099, as amended by Act of March 3, 1891, c. 559, 26 Stat. 1093.

There having been no compliance with his suggestion, the Commissioner, on June 4, 1894, held Mineral Entry 1166 for cancellation, and so advised the Register and Receiver. On December 4, 1895, the Commissioner's action was affirmed by the Secretary of the Interior. On April 3, 1896, Mineral Entry 1166 was finally cancelled, and the case was closed.

On December 29, 1904, a patent for the La Bruja and Bullion mining claims, including that part of lot 43 which, in this opinion, is called the Bullion tract, was issued to George Mainhart. Thereafter, until February 21, 1933, the United States did not own, or have any right, title or interest in or to, any part of lot 43.

As before stated, patents for the Daisy Hill, Gold Run and Arcturus claims were issued to plaintiff's predecessors in title on July 22, 1895, December 13, 1906, and October 5, 1931, respectively. Thereby, plaintiff's predecessors in title became, and plaintiff is now, the owner of said claims and of (1) all veins and lodes having their apexes within the surface boundaries of said claims and (2) all veins and lodes situated vertically beneath the surface of said claims and having their apexes in land theretofore granted by the United States to any agricultural patentee.

 Plaintiff's title is, of course, subject to the rights—commonly called extralateral rights—which § 3 of the Act of 1872 (R.S. § 2322, 30 U.S.C.A. § 26) grants to "locators of all mining locations," but § 3 does not, nor does any other law of the United States, grant any such rights to agricultural locators or patentees. As between a mineral patentee and an agricultural patentee, the mineral patentee is the fee simple owner of all veins and lodes situated vertically

beneath the surface of his claim, regardless of where their apexes may be. If, as claimed by defendants, there is situated vertically beneath the surface of plaintiff's claims a vein or lode having its apex in the Galena tract, so much of said vein or lode as is so situated was granted by the United States to plaintiff's predecessors in title and is now, and was at all pertinent times, the property of plaintiff.

 Prior to February 21, 1933, the trustees succeeded to all of the right, title and interest of Thomas N. Paine, Robert Watt and the heirs of William Watt in and to the Galena tract. Thereby, the trustees acquired only such title to the Galena tract as the United States had granted to Paine, which, as previously noted, was an agricultural title only. On February 21, 1933, the trustees executed a deed to the United States, reading as follows:

"This Indenture, made and entered into this 21st day of February, 1933, between [the trustees], parties of the first part, and United States of America, party of the second part, witnesseth:

"That the parties of the first part, for the purpose of vesting in the party of the second part the title acquired by Thomas N. Paine under the patent issued to him for [the Galena tract and other lands], to enable it to issue patent on Mineral Application No. 1166, for [the Galena tract] to the grantors herein, hereby grant, convey and transfer unto the party of the second part all the right, title, interest and estate vested in Thomas N. Paine, his heirs and assigns, in and to [the Galena tract], acquired by virtue of the patent issued to said Paine as agricultural claimant on December 30th, 1882. * * *"

On February 24, 1933, attorneys for the trustees transmitted this deed to the Commissioner of the General Land Office and, with it, an application requesting the Commissioner to "reinstate" Mineral Entry 1166 and to issue a patent for the Galena tract. On March 8, 1933, the Commissioner transmitted the application and the deed to the Register of the Sacramento land office and directed him to instruct the trustees to have the deed

---

[15] Section 8 provided: "That suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents. * * *" See 43 U.S.C.A. § 1166.

recorded, and then to "refile" it in the Sacramento land office. This was done. The deed was recorded on March 17, 1933, and was transmitted by the Register to the Commissioner on March 21, 1933.

By this deed, the United States got back only such title to the Galena tract as it had granted to Paine; that is to say, an agricultural title only. It did not thereby acquire, and did not then or thereafter own, any vein or lode situated vertically beneath the surface of plaintiff's claims and having its apex in the Galena tract. Nevertheless, on May 4, 1933, the Commissioner of the General Land Office "reinstated" Mineral Entry 1166 and, on May 19, 1933, without notice to plaintiff or anyone else, caused to be issued to the heirs of William Watt and Robert Watt[16] a patent which, as we have seen, purports to grant, not only the Galena tract, but also all veins and lodes, throughout their entire depth, the apexes of which are within the surface boundaries of said tract.

This instrument—the so-called Galena patent—is a mineral patent in form and name only. Actually, it is a mere reconveyance whereby the trustees got back their agricultural title to the Galena tract, and nothing more. Since, as we have shown, the United States was not on May 19, 1933, the owner of any vein or lode situated vertically beneath the surface of plaintiff's claims and having its apex in the Galena tract, the Land Department was, obviously, without jurisdiction to issue a patent for any vein or lode so situated. We hold, therefore, that, insofar as it purports to grant any such vein or lode, the Galena patent is void, and—being void, not merely voidable—was and is open to collateral attack. Reichart v. Felps, 6 Wall. 160, 165, 18 L.Ed. 849; Steel v. St. Louis Smelting Co., 106 U.S. 447, 452, 1 S.Ct. 389, 27 L.Ed. 226; Davis v. Weibbold, 139 U.S. 507, 529, 11 S.Ct. 628, 35 L.Ed. 238;

Hardin v. Jordan, 140 U.S. 371, 400, 11 S.Ct. 808, 838, 35 L.Ed. 428; Noble v. Union River Logging R. Co., 147 U.S. 165, 174, 13 S.Ct. 271, 37 L.Ed. 123.

Whether the vein or lode from which Grass Valley has mined and extracted ores beneath the surface of plaintiff's claims does or does not have its apex in the Galena tract, we need not and do not decide. If it does not it belongs to plaintiff. If it does, plaintiff is still the prima facie owner, said vein or lode being situated vertically beneath the surface of plaintiff's claims. The burden of disproving such ownership rested on defendants (Moulton Mining Co. v. Anaconda Copper Mining Co., 9 Cir., 23 F.2d 811, 817; Conkling Mining Co. v. Silver King Coalition Mines Co., 8 Cir., 230 F. 553, 561) and was not sustained. This vein or lode is, therefore, held to be the property of plaintiff.

Plaintiff's title to this vein or lode was disputed, not only by Grass Valley, but by all the other defendants. All asserted that prior to October 31, 1936, it belonged to the trustees, and that thereafter it belonged to Grass Valley. Idaho Maryland claimed to have a lien on it. McNear, Stephens, Wiltsee, MacBoyle and Lynn claimed no title in themselves, but joined the other defendants in disputing plaintiff's title and asserting title in Grass Valley. Dismissal of the suit against defendants other than Grass Valley was, therefore, unwarranted. Instead, there should have been a decree quieting plaintiff's title against all the defendants.

Plaintiff was and is also entitled to an injunction restraining defendants and each of them from entering upon said vein or lode and from mining or extracting ores therefrom, and to a judgment for damages.

Decree reversed and case remanded for further proceedings in conformity with this opinion.

---

[16] The date of Robert Watt's death does not appear. It is assumed, however, and apparently conceded, that he is dead, and that the patent issued to his and William Watt's heirs inured to the benefit of the trustees and their grantee, Grass Valley.